257 U.S. 419 (1922)
EX PARTE IN THE MATTER OF THE UNITED STATES, OWNER OF THE AMERICAN STEAMSHIP "WESTERN MAID," PETITIONER.
EX PARTE IN THE MATTER OF THE UNITED STATES, FORMER REQUISITIONED OR CHARTERED OWNER OF THE AUXILIARY SCHOONER "LIBERTY," PETITIONER.
EX PARTE IN THE MATTER OF THE UNITED STATES, FORMER REQUISITIONED AND CHARTERED OWNER OF THE AMERICAN STEAMSHIP "CAROLINIAN," PETITIONER.
Nos. 21, 22, 23, Original.
Supreme Court of United States.
Argued December 12, 13, 1921.
Decided January 3, 1922.
PETITIONS FOR WRITS OF PROHIBITION AND/OR MANDAMUS.
*421 Mr. Solicitor General Beck, with whom Mr. Assistant Attorney General Ottinger and Mr. J. Frank Staley, Special Assistant to the Attorney General, were on the brief, for the United States.
Mr. T. Catesby Jones, with whom Mr. James W. Ryan was on the brief, for respondent in No. 21, Original.
*429 MR. JUSTICE HOLMES delivered the opinion of the court.
These are petitions for prohibition to prevent District Courts of the United States from exercising jurisdiction of proceedings in rem for collisions that occurred while the vessels libeled were owned, absolutely or pro hac vice, by the United States, and employed in the public service. The questions arising in the three cases are so nearly the same that they can be dealt with together.
*430 The Western Maid was and is the property of the United States. On January 10, 1919, she was allocated by the United States Shipping Board to the War Department for service as a transport. She had been loaded with foodstuffs for the relief of the civilian population of Europe, to be delivered on arrival at Falmouth, England, to the order of the Food Administration Grain Corporation, the consignor, American Embassy, London, care of the Chief Quartermaster, American Expeditionary Forces, France; subject to the direction of Mr. Hoover. If it should prove impracticable to reship or redirect to the territories lately held by the Central Empires, Mr. Hoover was to resell to the Allied Governments or to the Belgian Relief; the foodstuffs to be paid for by the buyer. The vessel was manned by a navy crew. Later on the same day, January 10, 1919, in New York harbor, the collision occurred. On March 20, 1919, the vessel was delivered to the United States Shipping Board. The libel was filed on November 8, 1919. Act of September 7, 1916, c. 451, § 9, 39 Stat. 728, 730. The Lake Monroe, 250 U.S. 246. On February 20, 1920, the Government moved that it be dismissed for want of jurisdiction. The District Court overruled the motion. On April 11, 1921, the Attorney General moved for leave to file the present petition in this Court. Leave was granted and the case has been heard.
The Liberty was a pilot boat let to the United States on the bare-boat basis at a nominal rate of hire. She had been manned by a crew from the United States Navy and commissioned as a naval dispatch boat, and was employed to serve military needs in war service. The collision took place on December 24, 1917, while she was so employed, in Boston Harbor. Afterwards the vessel was redelivered to the owners and still later, on February 5, 1921, the suit now in question was brought against her. On February 14, under the Act of March 9, 1920, c. 95, § 4, 41 Stat. 525, *431 the United States filed a suggestion of its interest, and also set up the above facts. The District Court held that they constituted no defence and this petition was brought by the Attorney General along with that last mentioned.
The Steamship Carolinian had been chartered to the United States upon a bare-boat charter and had been assigned to the War Department, by which she was employed as an army transport and furnished with an army crew. While she was so employed the collision took place in the harbor of Brest, France, on February 15, 1918. Afterwards the Carolinian was returned to the owners, and she was employed solely as a merchant vessel on July 9, 1920, when the suit in question was begun, under which the vessel was seized. In the same month the United States filed a suggestion of interest, and on January 6, 1921, set up the foregoing facts and prayed that the libel be dismissed. The District Court maintained its jurisdiction and this petition was brought by the Attorney General along with the other two. 270 Fed. 1011.
It may be assumed that each of these vessels might have been libeled for maritime torts committed after the redelivery that we have mentioned. But the Act of September 7, 1916, c. 451, § 9, does not create a liability on the part of the United States, retrospectively, where one did not exist before. Neither, in our opinion, is such a liability created by the Act of March 9, 1920, c. 95, § 4, authorizing the United States to assume the defence in suits like these. It is not required to abandon any defence that otherwise would be good. It appears to us plain that before the passage of these acts neither the United States nor the vessels in the hands of the United States were liable to be sued for these alleged maritime torts. The Liberty and the Carolinian were employed for public and government purposes, and were owned pro hac vice by the United States. It is suggested that the Western Maid was a merchant vessel at the time of the *432 collision, but the fact that the food was to be paid for and the other details adverted to in argument cannot disguise the obvious truth, that she was engaged in a public service that was one of the constituents of our activity in the war and its sequel and that had no more to do with ordinary merchandizing than if she had carried a regiment of troops. The only question really open to debate is whether a liability attached to the ships which although dormant while the United States was in possession became enforcible as soon as the vessels came into hands that could be sued.
In deciding this question we must realize that however ancient may be the traditions of maritime law, however diverse the sources from which it has been drawn, it derives its whole and only power in this country from its having been accepted and adopted by the United States. There is no mystic over-law to which even the United States must bow. When a case is said to be governed by foreign law or by general maritime law that is only a short way of saying that for this purpose the sovereign power takes up a rule suggested from without and makes it part of its own rules. The Lottawanna, 21 Wall. 558, 571, 572. Dalrymple v. Dalrymple, 2 Hagg. Cons. 54, 58, 59. Dicey, Conflict of Laws, 2d ed., 6, 7. Also we must realize that the authority that makes the law is itself superior to it, and that if it consents to apply to itself the rules that it applies to others the consent is free and may be withheld. The sovereign does not create justice in an ethical sense, to be sure, and there may be cases in which it would not dare to deny that justice for fear of war or revolution. Sovereignty is a question of power, and no human power is unlimited. Carino v. Insular Government of the Philippine Islands, 212 U.S. 449, 458. But from the necessary point of view of the sovereign and its organs whatever is enforced by it as law is enforced as the *433 expression of its will. Kawananakoa v. Polyblank, 205 U.S. 349, 353.
The United States has not consented to be sued for torts, and therefore it cannot be said that in a legal sense the United States has been guilty of a tort. For a tort is a tort in a legal sense only because the law has made it so. If then we imagine the sovereign power announcing the system of its laws in a single voice it is hard to conceive it as declaring that while it does not recognize the possibility of its acts being a legal wrong and while its immunity from such an imputation of course extends to its property, at least when employed in carrying on the operations of the Government,  specifically appropriated to national objects, in the language of Buchanan v. Alexander, 4 How. 20,  yet if that property passes into other hands, perhaps of an innocent purchaser, it may be seized upon a claim that had no existence before. It may be said that the persons who actually did the act complained of may or might be sued and that the ship for this purpose is regarded as a person. But that is a fiction not a fact and as a fiction is the creation of the law. It would be a a strange thing if the law created a fiction to accomplish the result supposed. It is totally immaterial that in dealing with private wrongs the fiction, however originated, is in force. See Liverpool, Brazil & River Plate Steam Navigation Co. v. Brooklyn Eastern District Terminal, 251 U.S. 48, 53. The personality of a public vessel is merged in that of the sovereign. The Fidelity, 16 Blatchf. 569, 573. Ex parte State of New York, No. 2, 256 U.S. 503.
But it is said that the decisions have recognized that an obligation is created in the case before us. Legal obligations that exist but cannot be enforced are ghosts that are seen in the law but that are elusive to the grasp. The leading authority relied upon is The Siren, 7 Wall. 152. *434 The ground of that decision was that when the United States came into court to enforce a claim it would be assumed to submit to just claims of third persons in respect of the same subject-matter. 7 Wall. 154. Carr v. United States, 98 U.S. 433, 438. In reaching its result the Court spoke of such claims as unenforcible liens, but that was little more than a mode of expressing the consent of the sovereign power to see full justice done in such circumstances. It would have been just as effective and more accurate to speak of the claims as ethical only, but recognized in the interest of justice when the sovereign came into court. They were treated in this way by Dr. Lushington in The Athol, 1 Wm. Rob. 374, 382. Further distinctions have been taken that need not be adverted to here. There was nothing decided in Workman v. New York City, 179 U.S. 552, that is contrary to our conclusion, which, on the other hand, is favored by The Fidelity, 16 Blatchf. 569, 573, and Ex parte State of New York, No. 1, 256 U.S. 490, and Ex parte State of New York, No. 2, 256 U.S. 503. The last cited decisions also show that a prohibition may be granted in a case like this. See The Ira M. Hedges, 218 U.S. 264, 270.
Rule absolute for writs of prohibition.
MR. JUSTICE McREYNOLDS did not hear the argument in this case and took no part in the decision.
MR. JUSTICE McKENNA, with whom concurred Mr. Justice Day and Mr. Justice Clarke, dissenting.
The question in the cases is without complexity, and the means of its solution ready at hand. The question is, What is the law applicable to colliding vessels and what remedy is to be applied to the offending one, if there be an offending one? The question, I venture to say, has unequivocal answer in a number of decisions of this court if they be taken at their word. And why should they *435 not be? That they have masqueraded in a double sense, cannot be assumed; that they have successively justified implications adverse to their meaning would be a matter of wonder.
What then do they express to be the law of colliding vessels, the assignment of offense, if offence there be, and how far is it dependent, if at all, upon whether the offender was in public or private service?
The answer may be immediate. This court has kept steadily in mind that the admiralty jurisprudence of the country, as adopted by the Constitution, has a distinctive individuality, and this court has felt the necessity of keeping its principles in definite integrity, and the remedies intact by which its principles can alone be realized. The most prominent and efficient of its remedies is that which subjects its instrumentalities, its ships particularly, to judgment. Personality is assigned to them and they are considered in pledge to indemnify any damage inflicted through them. They are made offenders and have the responsibility of offenders, and the remedy is suited to the purpose. In Rounds v. Cloverport Foundry & Machine Co., 237 U.S. 303, 306, it is said, Mr. Justice Hughes delivering the opinion of the court, "The proceeding in rem which is within the exclusive jurisdiction of admiralty is one essentially against the vessel itself as the debtor or offending thing,  in which the vessel is itself `seized and impleaded as the defendant, and is judged and sentenced accordingly.'"
In The John G. Stevens, 170 U.S. 113, 120, the court, through Mr. Justice Gray, declared, "The foundation of the rule that collision gives to the party injured a jus in re in the offending ship is the principle of the maritime law that the ship, by whomsoever owned or navigated, is considered as herself the wrongdoer, liable for the tort, and subject to a maritime lien for the damages. This principle, as has been observed by careful text writers on both *436 sides of the Atlantic, has been more clearly established, and more fully carried out, in this country than in England. Henry on Admiralty, § 75, note; Marsden on Collisions (3d ed.) 93." The case in many ways and by many citations fortifies and illustrates the principle.[1]
The Siren was cited and the fact is pertinent as we shall presently see. The China, 7 Wall. 53, was also cited and quoted from. The quotation was repeated in Ralli v. Troop, 157 U.S. 386, 402, 403, where it is said that the liability of a vessel is not derived from the authority or agency of those on board, either under the civil or common law, "but upon a distinct principle of maritime law, namely, that the vessel, in whosesoever hands she lawfully is, is herself considered as the wrongdoer, liable for the tort, and subject to a maritime lien for the damages."
In Tucker v. Alexandroff, 183 U.S. 424, 438, this court by Mr. Justice Brown gave graphic representation to the same principle. He described a ship prior to her launching as "a mere congeries of wood and iron" but after launching she took on a name, a personality of her own and had in a sense volition, became competent to contract and be contracted with, sue and be sued, could have agents of her own, was capable of committing a tort and was pledged to its reparation. Cases were cited, The Siren among others.
The doctrine thus explicitly announced is denied application in the pending cases and upon what grounds? As I understand, the contention is that a vessel has not independent guilt, that there must be fault in its owner or *437 operator, his fault becoming its fault. This has been said, but it puts out of view her character as bail and that the innocent victim of the injury she has inflicted shall not be remitted to the insufficient or evasive responsibility of persons but shall have the security of the tangible and available value of the thing. And this responsibility and fullness of indemnity we have seen it was declared in The John G. Stevens, supra, distinguished the law of this country from that of England.
But if the contention were conceded it would not determine these cases. I reject absolutely that because the Government is exempt from suit it cannot be accused of fault. Accountability for wrong is one thing, the wrong is another.
But I do not have to beat about in general reasoning. I may appeal to the authority of The Siren, 7 Wall. 152, and the cases that have approved and followed it. A gloss is attempted to be put upon it  which we think is unjustified and inaccurate unless indeed, it can be asserted that the writer of the opinion did not know the meaning of the words he used, and, that the members of the court who concurred with him, were equally deficient in understanding. And their insensibility to what the words conveyed had no excuse. A dissenting justice tried to bring their comprehensive import to understanding, proclaimed indeed, that the words had the extent and consequence that the court now says were not intended or accomplished.
The Siren, while in charge of a prize master and crew, having been taken in prize by the United States, ran into in the port of New York and sank the sloop Harper. The collision was regarded by the court as the fault of the Siren. She was condemned as prize and sold and the proceeds deposited with the Assistant Treasurer of the United States. The owners of the Harper asserted a claim upon her and her proceeds for the damages sustained *438 by the collision. The District Court rejected the claim. Its action was reversed by this court.
The United States was an actor in the case and this was regarded by the court, who spoke by Mr. Justice Field, as removing the impediment to the claim of the owners of the Harper. It was not, however, the basis of recovery. There was no confusion in the language or conception of the learned Justice, nor in the court, of that. By becoming the actor, the United States, it was said, waived its exemption from direct suit and opened "to consideration all claims and equities in regard to the property libelled"  not, of course, that the waiver of exemption created the "claims and equities". They, it was explicitly said, were created against the offending vessel by the collision. "In such case", the language was, "the claim exists equally as if the vessel belonged to a private citizen, but for reasons of public policy, already stated, cannot be enforced by direct proceedings against the vessel." And again, "The inability to enforce the claim against the vessel is not inconsistent with its existence."
The distinction was clearly made between exemption of the United States, the offense of the vessel and the existence of a claim against it in consequence of its offence. And the distinction was emphasized in the dissent of Mr. Justice Nelson. He was at pains to distinguish between liability to suit and legal liability for the act of injury, the ground of suit. And the basis of his dissent was the same as the basis of the opinion of the court in the present cases, but not so epigrammatically expressed. In the opinion in these cases it is said that "the United States has not consented to be sued for torts, and therefore it cannot be said that in a legal sense the United States has been guilty of a tort. For a tort is a tort in a legal sense only because the law has made it so."
Mr. Justice Nelson was more discursive. He said that "if the owner of the offending vessel [he regarded the Siren as owned by the United States] is not liable at all *439 for the collision, it follows, as a necessary legal consequence, that there can be no lien, otherwise the non-liability would amount to nothing." And again, "If the government is not responsible, upon the principles of the common law, for wrongs committed by her officers or agents, then, whether the proceedings in the admiralty are against the vessel, or its proceeds, the court is bound to dismiss them." And giving point to this view the learned Justice observed that "no principle at common law is better settled than that the government is not liable for the wrongful acts of her public agents."
I repeat, that in view of these extracts from Mr. Justice Nelson's dissent, misapprehension of its opinion by the court is not conceivable nor carelessness of utterance. Yet the opinion in the present cases practically so asserts and, in effect, regards Mr. Justice Nelson's dissent as the law of the Siren and not that which the court pronounced. The court decided that the vessel was the offending thing, and though it could not be reached in the hands of the Government, this "inability to enforce the claim against the vessel" was "not inconsistent with its existence."
The inevitable deduction is that in such situation the enforcement of a claim is suspended only, and when the vessel passes from the hands of the Government, as the offending vessels have in the cases at bar, they and "all claims and equities in regard to" them may be enforced.
The case was commented on in The Davis, 10 Wall. 15, 20, and the gloss now put upon it rejected. It is there said that the well supported doctrine of the case is "that proceedings in rem to enforce a lien against property of the United States are only forbidden in cases where, in order to sustain the proceeding, the possession of the United States must be invaded under process of the court."
So again in Workman v. New York City, 179 U.S. 552, where it is said, Chief Justice White delivering the opinion of the court, after an exhaustive review of cases, such as *440 he usually gave, "It results that, in the maritime law, the public nature of the service upon which a vessel is engaged at the time of the commission of a maritime tort affords no immunity from liability in a court of admiralty, where the court has jurisdiction." In view of this it is difficult to understand how it can be said that there was nothing that case decided contrary to the conclusion in these cases.
Against this array of cases and their reasoning, Ex parte State of New York, No. 2, 256 U.S. 503, and Ex parte State of New York, No. 1, 256 U.S. 490, are adduced. Neither case has militating force. The latter case decided nothing but that a State cannot be sued without its consent. An indisputable proposition which this court in its opinion had to clear from confusing or disturbing circumstances. In the former case, The Queen City, a steam tug, was in the possession and service of the State of New York and to have awarded process against it as the District Court did, would have arrested the service. This court rightfully reversed that action. The tug had not been released from that immunity as the vessels were in the pending cases.
Counsel for claimants in opposition to the petition cite cases at circuit and district which followed The Siren.[1a] *441 It is not necessary to review or comment upon them. They are testimony of what the judiciary of the country considered and consider The Siren and other cases decided. Therefore we cannot refrain from saying that it is strange, that notwithstanding the language of The Siren, its understanding and acceptance in many cases in this court, the enforcement of its doctrine at circuit and district, it should now be declared erroneous. The cases at bar would seem to be cases for the application of the maxim of stare decisis which ought to have force enough to resist a change based on finesse of reasoning or attracted by the possible accomplishment of a theoretical correctness.
The rules should be discharged.
NOTES
[1] General Mutual Insurance Co. v. Sherwood, 14 HOW. 351, 363; The Creole, 2 Wall. Jr. 485, 518; The Mayurka, 2 Curtis, 72, 77; The Young Mechanic, 2 Curtis, 404; The Kiersage, 2 Curtis, 421; The Yankee Blade, 19 How. 82, 89; The Rock Island Bridge, 6 Wall. 213, 215; The China, 7 Wall. 53, 68; The Siren, 7 Wall. 152, 155; The Lottawanna, 21 Wall. 558, 579; The J.E. Rumbell, 148 U.S. 1, 10, 11, 20; The Glide, 167 U.S. 606.
[1a] The U.S.S. Hisko, U.S.S. Roanoke and U.S.S. Pocahontas (Circuit Judge Manton, S.D.N.Y.) (March 17, 1921, unreported opinion annexed to brief);

The U.S.S. Newark (District Judge Knox, S.D.N.Y.) (March 18, 1921, unreported opinion annexed to brief);
The U.S.S. Sixaola (District Judge Mayer, S.D.N.Y.) (April 21, 1921, unreported opinion annexed to brief);
The F.J. Luckenbach, 267 Fed. 931; The Liberty, now before this court; The Carolinian, 270 Fed. 1011, also now before this court.
Also: The Florence H., 248 Fed. 1012; The Gloria, 267 Fed. 929; The City of Philadelphia, 263 Fed. 234.
Counsel also cites: The Tampico, 16 Fed. 491; Thompson Navigation Co. v. City of Chicago, 79 Fed. 984; Johnson Lighterage Co., 231 Fed. 365; The Attualita, 238 Fed. 909; The Luigi, 230 Fed. 493; The Othello, 5 Blatchf, 343.