**Fidel Catarino BLANCO, as Administrator of the Goods, Chattels and Credits of Catarino Blanco, Deceased, Plaintiff-Appellant,**

v.

**UNITED STATES of America, Defendant-Appellee.**

**No. 85–6044.**

United States Court of Appeals, Second Circuit.

Argued May 20, 1985.

Decided Oct. 15, 1985.

Paul S. Edelman, New York City (Kreindler & Kreindler, New York City), for plaintiff-appellant.

Janis G. Schulmeisters, Atty. in Charge, Torts Branch, Civil Division, Dept. of Justice, New York City (Rudolph W. Giuliani, U.S. Atty., Dept. of Justice, New York City), for defendant-appellee.

Before FRIENDLY and PRATT, Circuit Judges, and METZNER,* District Judge.

FRIENDLY, Circuit Judge:

This appeal in a suit in admiralty for the wrongful death of a seaman, begun more

* Honorable Charles M. Metzner, United States District Judge for the Southern District of New York, sitting by designation.

than seven years ago and never tried, raises interesting questions, some seemingly of first impression, too numerous for summarization. We affirm.

The facts, gleaned from the complaint and other papers, are as follows: Plaintiff, a citizen of the United States, was granted limited letters of administration by the Surrogate's Court of Bronx County, New York, for the purpose of filing this suit in admiralty against the United States for the wrongful death of his father, Catarino Blanco, also a United States citizen. Catarino had been employed by the United States through an operating agent, Marine Transport Lines, Inc. (MTL), as a seaman on the USNS Sealift Atlantic. Allegedly, on or about April 16, 1977, while the Sealift Atlantic was on the high seas, Catarino Blanco became "extremely mentally unstable and was experiencing hallucinations that someone was trying to kill him." A superior officer ordered him sent to the vessel's hospital. However, due to inadequate supervision, he was able to walk out of the hospital and went overboard. He was survived by his wife and thirteen children, all Honduran nationals except for one son, Fidel Catarino Blanco, plaintiff in the present suit.

The complaint predicated the jurisdiction of the court to entertain the suit against the United States on the Public Vessels Act (PVA), 46 U.S.C. § 781 *et seq.*, or, alternatively, on the Suits in Admiralty Act (SIAA), 46 U.S.C. § 741 *et seq.* The difference between them which is significant in the present context is that the PVA contains a provision, 46 U.S.C. § 785 (the "reciprocity clause"), having no counterpart in the SIAA, which provides:

> No suit may be brought under this chapter by a national of any foreign government unless it shall appear to the satisfaction of the court in which suit is brought that said government, under similar circumstances, allows nationals of the United States to sue in its courts.

Although the complaint did not refer to any statute creating a cause of action, the United States does not dispute that, absent its defense under the reciprocity clause of the PVA, the plaintiff could appropriately have relied on the Jones Act, 46 U.S.C. § 688, or the Death on the High Seas Act, 46 U.S.C. § 761 *et seq.*

The United States pleaded the reciprocity clause of the PVA as an affirmative defense. Plaintiff moved to strike this and the United States cross-moved to dismiss the complaint. Judge Cooper denied plaintiff's motion and granted the motion of the United States with leave to plaintiff to amend his complaint "to allege reciprocity as required by the jurisdictional provisions of the Public Vessels Act." 464 F.Supp. 927, 934 (S.D.N.Y.1979).

Plaintiff then submitted an amended complaint that was identical to his original complaint but for the addition of a confused allegation concerning reciprocity.[1] Thus matters rested for three years until plaintiff, represented by new counsel, moved on April 28, 1982, for reconsideration of the 1979 order. The first ground of the motion was allegedly newly discovered evidence that the Sealift Atlantic was not owned by the United States and therefore, in counsel's view, was not a public vessel, permitting jurisdiction to be predicated on the SIAA rather than the PVA and thereby removing § 785 as an obstacle. The second ground rested on the American citizenship of the decedent and of plaintiff, his personal representative, which plaintiff contended made § 785 inapplicable, and also on Articles I and II of the Treaty of Friendship, Commerce and Consular Rights between the United States and Honduras (the "Honduras Treaty"), 45 Stat. 2618 (1929), proclaimed on July 23, 1928, which plaintiff contended had superseded § 785 with respect to wrongful death actions on behalf of Honduran nationals. Nothing was said about the amended complaint.

In June 1982 the Government submitted answering affidavits containing facts about the Sealift Atlantic. It is one of nine Sealift-class tankers, all of which are privately owned but were built for bareboat charter to the United States for a period of five years, with renewal options totaling 20 years. The Sealift Atlantic operates as

---

**1.** This allegation read:

This court has jurisdiction, and this action is brought, pursuant to the Public Vessels Act, 46 U.S.C. § 781, et seq., in that, in addition to other applicable Sections of the Public Vessels Act, upon information and belief, there is reciprocity as required by the jurisdictional provisions of the Public Vessels Act, 46 U.S.C. § 785, or, alternatively, the Suits in Admiralty Act, 46 U.S.C. § 741, et seq.

part of the Navy's Military Sealift Command under schedules fixed by the Command, transporting Department of Defense petroleum products in furtherance of the nation's defense. Personnel are hired and the details of operations are conducted by MTL under the Navy's orders.

On December 1, 1982, Judge Cooper denied plaintiff's motion as untimely under Rule 3(m) of the Local Rules of Civil Procedure for the Southern District of New York and its successor, Rule 3(j), which require that motions for reconsideration be "served within ten (10) days after the filing of the court's determination of the original motion," and under the one-year limitation in F.R.Civ.P. 60(b) applicable to motions based on mistake, inadvertence or newly discovered evidence.

On October 18, 1983, counsel for plaintiff moved a second time for reconsideration, alleging that Judge Cooper had agreed at a conference held on October 6, 1983, to allow another motion solely on the issue of whether the Honduras Treaty took precedence over the reciprocity clause of the PVA. Again, nothing was said about the allegation in the amended complaint that the reciprocity clause had been satisfied. The Government opposed both on the merits and for repetitiveness and untimeliness. On December 27, 1983, the court denied the motion.

Nothing having been done by plaintiff to pursue the amended complaint, the court, on January 31, 1985, entered an order reciting:

The above entitled cause having been dismissed pursuant to our Memorandum filed December 28, 1983, it is

ORDERED that this action is statistically closed.

Finally, on February 22, 1985, the court, at plaintiff's request, entered a judgment dismissing the action, which we quote in the margin.[2] Six days later plaintiff filed a notice of appeal from this judgment, as well as from the opinion and orders of February 14, 1979, December 1, 1982, December 27, 1983, and January 31, 1985.

## DISCUSSION

### I. *Appealability*

◼ The Government contends that the appeal was untimely since it should have been taken within 60 days from the filing of the 1979 opinion and order or, in the alternative, from the filing of one or the other of the two orders denying reconsideration. There is no merit in this contention. No final decision was rendered by the district court until it filed its judgment on February 26, 1985, dismissing the complaint. It is well established that a district court's order dismissing a complaint with leave to amend is not final and therefore not then appealable. *See Elfenbein v. Gulf & Western Industries, Inc.*, 590 F.2d 445, 448 (2 Cir.1978); *see also* 9 *Moore's Federal Practice* ¶ 110.08[1], at 115 n. 27 (1985) (citing cases). If the 1979 order was not final and appealable, orders refusing to reconsider it likewise could not have been. Indeed, the district court erred each time in considering plaintiff's motions to have been made under F.R.Civ.P. 60(b), since that section of the rule relates only to the reconsideration of final judgments and orders. *See* 7 *Moore's Federal Practice, supra*, ¶ 60.-20.[3]

---

**2.** Various motions having come before me, concerning defenses under the Public Vessels Act, including defenses under the Reciprocity Clause and said defenses having been upheld by Opinions and Orders of February 14, 1979, December 1, 1982 and December 27, 1983, and January 31, 1985, it is

ORDERED AND ADJUDGED that Defendant's Motion to Dismiss the complaint be and the same hereby is granted; and it is further

ORDERED AND ADJUDGED that judgment be entered for the Defendant.

**3.** A more serious question is whether the court was justified in dismissing the complaint when plaintiff had served an amended complaint alleging that the reciprocity clause had been satisfied. But plaintiff, apparently realizing that he could not produce facts to support the allegation of reciprocity in the amended complaint, has not raised this point in brief or argument, but rather has argued, as he did in his motions for reconsideration in the district court, that the 1979 order was in error. Under these circum-

## II. Applicability of the Public Vessels Act

■ Section 781 of the PVA provides:

A libel in personam in admiralty may be brought against the United States, or a petition impleading the United States, for damages caused by a public vessel of the United States, and for compensation for towage and salvage services, including contract salvage, rendered to a public vessel of the United States: *Provided,* That the cause of action arose after the 6th day of April, 1920.

Section 742 of the SIAA provides, in pertinent part:

In cases where if ... [a vessel owned by, in the possession of, or operated by or for the United States or any wholly owned corporation of the United States] were privately owned or operated, ... or if a private person or property were involved, a proceeding in admiralty could be maintained, any appropriate nonjury proceeding in personam may be brought against the United States or against such corporation.

Although the two statutes overlap on their face, actions involving public vessels are not cognizable under the SIAA but must be brought solely under the PVA.[4]

Plaintiff contends that suit in this case is properly brought under the SIAA and the reciprocity clause of the PVA is therefore inapplicable because the Sealift Atlantic is not a public vessel. One of the conditions to being a public vessel—use as directed by the government exclusively for a public purpose—is clearly met in this case. As stated above, the Sealift-class tankers are engaged solely in non-commercial public service under the direction of the Military Sealift Command. The term "public vessel" was not intended to be limited to warships.[5] While there is equally little merit in plaintiff's claim that the Sealift Atlantic is not a public vessel because she is privately owned, though bareboat chartered to the United States, it may be well to discuss this at greater length in order to save the time of other courts that may be confronted with similar claims.

■ "The fundamental characteristic of a demise or bareboat charter is the shifting of the exclusive possession and

stances we decline to direct an apparently useless remand.

**4.** The SIAA, as originally enacted, was restricted to cases in which the vessel involved was "employed as a merchant vessel." Pub.L. No. 66–156, § 2, 41 Stat. 525, 526 (1920). Although from the beginning it was clear that "merchant vessel" and "public vessel" were mutually exclusive terms, *United States v. United Continental Tuna Corp.,* 425 U.S. 164, 167 n. 1, 96 S.Ct. 1319, 1322 n. 1, 47 L.Ed.2d 653 (1976), courts were never able to define them satisfactorily, and much litigation ensued. *See Calmar S.S. Corp. v. United States,* 345 U.S. 446, 73 S.Ct. 733, 97 L.Ed. 1140 (1953). This confusion exacerbated the jurisdictional uncertainties already surrounding the SIAA and the PVA, such as whether maritime contract claims exceeding $10,000 belonged on the admiralty side of the district courts under one or the other of the two statutes or in the Court of Claims under the Tucker Act, 28 U.S.C. §§ 1346(a)(2), 1491. In an effort to ease the consequences of bringing such claims in the wrong forum, Congress in 1960 provided for the transfer of cases between the Court of Claims and the district courts, Pub.L. No. 86–770, §§ 1–2, 74 Stat. 912 (1960) (codified as 28 U.S.C. §§ 1406(c), 1506), and at the same time amended the SIAA by deleting the "employed as a merchant vessel" proviso, *id.,* § 3, 74 Stat. 912 (1960) (amending 46 U.S.C. § 742). Although this amendment made the SIAA on its face applicable to suits involving public vessels, the Supreme Court has held that Congress had no intention of expanding the SIAA at the expense of the PVA and that "claims within the scope of the Public Vessels Act remain subject to its terms after the 1960 amendment to the Suits in Admiralty Act." *Continental Tuna,* 425 U.S. at 181, 96 S.Ct. at 1329. In particular, litigants may not escape the PVA's reciprocity requirement in suits involving public vessels by invoking jurisdiction under the SIAA. *Id.*

**5.** *See* Letter from Attorney General Harlan F. Stone (April 8, 1924), *in* H.R.Rep. No. 913, 68th Cong., 1st Sess. 11 (1924) (commenting on H.R. 6989, a nearly identical predecessor bill to the PVA: "The classes of public vessels involved include the vessels of the War, Navy, Treasury, and Commerce Departments, and Shipping Board vessels engaged exclusively in carrying Government supplies."). The Supreme Court has given weight to this letter as an indication of the intended effect of the PVA. *See American Stevedores, Inc. v. Porello,* 330 U.S. 446, 452, 67 S.Ct. 847, 850, 91 L.Ed. 1011 (1947).

control of the chartered vessel from the owner to the charterer during the charter period." Harper, Demise Charters: Responsibilities of Owner or Charterer for Loss or Damage, 49 *Tul.L.Rev.* 785, 785 (1975). Because the bareboat charterer, also called a demise charterer, is considered the owner of the chartered vessel *pro hac vice*, his potential liabilities to third persons are much more extensive than those of either the time or the voyage charterer. "In general, all *in personam* liabilities arising out of the ship's operation are brought home to the demise charterer." Gilmore & Black, *The Law of Admiralty* § 4–23 (2d ed. 1975). The demise charterer is liable for collision damages, *The Barnstable*, 181 U.S. 464, 468, 21 S.Ct. 684, 686, 45 L.Ed. 954 (1901), as well as for personal injuries resulting from unseaworthiness of the vessel, *Reed v. The Yaka*, 373 U.S. 410, 412–13, 83 S.Ct. 1349, 1351–52, 10 L.Ed.2d 448 (1963), and he is deemed to be the crew's "employer" for purposes of Jones Act liability, *Massey v. Williams-McWilliams, Inc.*, 414 F.2d 675, 676 n. 1 (5th Cir.1969), *cert. denied*, 396 U.S. 1037, 90 S.Ct. 682, 24 L.Ed.2d 681 (1970). In addition, the demise charterer qualifies as the "owner" of the vessel for purposes of statutes limiting liability, which time and voyage charterers do not. Gilmore & Black, *supra*, § 4–23.

■ In short, admiralty law draws few significant distinctions between absolute ownership and ownership *pro hac vice* under a bareboat charter in determining liability to third persons for collision damage, injury, and death. The Supreme Court clearly recognized the distinctive character of the bareboat charter in *Calmar Steamship Corp. v. United States*, 345 U.S. 446, 73 S.Ct. 733, 97 L.Ed. 1140 (1953), where in dealing with a question relating to the status of a privately owned ship under time charter to the United States and employed in the transport of military equipment and supplies for hire, the Court was at pains to say:

> [T]he problem [is not] the same when a vessel owned, absolutely or *pro hac vice*, by the United States is involved as when one privately owned and operated is in question. In the former case the consequence of holding that a vessel was not "employed as a merchant vessel" is, in the great number of instances, that the libel is dismissed under the Suits in Admiralty Act *only to be heard under the Public Vessels Act in the same admiralty court.*

*Id.* at 454–55, 73 S.Ct. at 737 (emphasis added).

Investigation of the background against which Congress acted in passing the PVA further supports the position that the Sealift Atlantic is a public vessel. Prior to 1916, sovereign immunity barred any suit for damages caused by a vessel owned or operated by the United States. Persons injured by such vessels could petition Congress for a private bill authorizing an action in the Court of Claims. In addition, the Secretary of the Navy was authorized after 1910 to settle, in amounts up to five hundred dollars, claims for damages caused by collision with "vessels of the navy." Pub.L. No. 61–261, 36 Stat. 605, 607 (1910). These limited remedies, though cumbersome and often inequitable, did not occasion widespread hardship during this period since the American merchant fleet was small and the United States was only a minor participant in shipping. *See* Gilmore & Black, *supra*, § 11–4 at 965.

When the shadow cast by World War I finally touched the United States, an effort to build up the country's merchant fleet began. The Shipping Act of 1916, Pub.L. No. 64–260, 39 Stat. 728, created the United States Shipping Board for the purpose of developing a merchant marine and empowered the Board to build, buy, charter and operate merchant vessels. In *The Lake Monroe*, 250 U.S. 246, 39 S.Ct. 460, 63 L.Ed. 962 (1919), the Supreme Court held that Shipping Board merchant vessels were subject to proceedings *in rem* in admiralty, including arrest and seizure, under § 9 of the Shipping Act. Concerned about the bottlenecks and expenses that this decision might impose on Shipping Board merchant

vessels, Congress in 1920 enacted the SIAA to substitute for the remedies of arrest and seizure a right of action *in personam* against the United States in cases where either an *in rem* or an *in personam* liability would have arisen on the same facts as against a private owner. *Blamberg Brothers v. United States,* 260 U.S. 452, 458–59, 43 S.Ct. 179, 180–81, 67 L.Ed. 346 (1923). The SIAA encompassed suits involving vessels owned by, in the possession of, or operated by or for the United States as long as such vessels were "employed as merchant vessels." Pub.L. No. 66–156, §§ 1–2, 41 Stat. 525–26 (1920). But the SIAA did not change the prevailing law with respect to public vessels. In *The Western Maid,* 257 U.S. 419, 42 S.Ct. 159, 66 L.Ed. 299 (1922), the Supreme Court held that the SIAA did not subject the United States to liability *in personam* for damages caused by government vessels "employed for public and government purposes," *id.* at 431, 42 S.Ct. at 160, nor subject the vessels themselves to liability *in rem.*[6] The case involved three ships: the Western Maid, which was owned by the United States, and the Liberty and the Carolinian, both bareboat chartered by the United States from private owners. The Court's opinion drew no distinction among the ships, however, on the basis of formal ownership; characterizing the United States as owner *pro hac vice* of the Liberty and the Carolinian, the Court held that all three vessels fell outside of the SIAA.

*The Western Maid* merely added fuel to the fire that had already been building in Congress to supplement the SIAA with a waiver of sovereign immunity for damages caused by public vessels. Claims for such damages were becoming more frequent with the great increase in government shipping during and following World War I. Starting in 1920, various bills were introduced in Congress to waive sovereign immunity for public vessels. The purpose of Congress in enacting the PVA was to provide for the award against the Government of damages caused by government vessels that fell outside the scope of the SIAA. Under *The Western Maid,* such vessels included both government-owned vessels and privately owned vessels under bareboat charter to the United States. We can properly assume that the participants in the process of enacting the PVA were aware of *The Western Maid;* in fact, Attorney General Stone mentioned the case specifically in his letter, *see supra* note 5, to the House committee in charge of the bill. To the extent we are willing to attribute this understanding to the Congress as a whole, it further supports the conclusion that Congress understood the term "public vessel" in the PVA to include a vessel under bareboat charter to the United States and used solely in public service.

Beyond this, other related statutes using the term "public vessel" define it to include vessels bareboat chartered to the United States and used solely in public service. Thus, 10 U.S.C. §§ 7721–7722 authorize the Secretary of the Navy, during time of war, to stay proceedings in any suit against the United States under the PVA for, *inter alia,* "damage caused by a vessel in the naval service" if the prosecution of such suit would endanger national security. "Vessel in the naval service" is defined as "any vessel of the Navy, manned by the Navy, or chartered on bareboat charter to the Navy." *Id.* § 7721(b)(1). The same definition of "vessel in the naval service"

---

**6.** The specific issue in the case with respect to *in rem* liability was whether maritime torts allegedly committed by a vessel under sovereign control could give rise to a lien that, while unenforceable against the sovereign, might lie "dormant" and later be enforced when the vessel came into private hands—by way of purchase for a vessel owned by the United States, or by way of redelivery to the original owners for a vessel on bareboat charter. Dismissing the notion of "[l]egal obligations that exist but cannot be enforced" as "ghosts that are seen in the law but that are elusive to the grasp," 257 U.S. at 433, 42 S.Ct. at 161, the Court, speaking through Justice Holmes, held that no lien could arise against a vessel under such circumstances. This holding occasioned considerable commentary, with a distinguished member of this court accusing Justice Holmes of willfully misconstruing the authorities. *See* Hough, Admiralty Jurisdiction—of Late Years, 37 *Harv.L.Rev.* 529, 543 (1924).

appears in 10 U.S.C. §§ 7621–7622, which authorize the Secretary of the Navy to settle admiralty claims against the United States for, *inter alia,* damages caused by such vessels. *See id.* § 7621(a)(1). Finally, 33 U.S.C. § 1321, which governs oil and hazardous substance liability on the navigable waters of the United States, defines "public vessel" in part as "a vessel owned or bareboat-chartered and operated by the United States." *Id.* § 1321(a)(4).

We hold therefore that the Sealift Atlantic is a public vessel and that this action was maintainable only under the PVA.

### III. *The Effect of the Honduras Treaty*

■ Plaintiff argues that even if the Sealift Atlantic was a public vessel, the reciprocity clause of the PVA, enacted on March 3, 1925, does not apply because it was superseded by Articles I and II of the Honduras Treaty, proclaimed on July 23, 1928.[7]

The Honduras Treaty was one of the many treaties of friendship, commerce and consular rights ("FCCR" treaties) proclaimed during the interwar years as the United States, in recognition of prevailing international practice, decided to conduct its future trade relations on an unconditional most-favored-nation basis. *See* [1923] 1 *Papers Relating to the Foreign Relations of the United States* 121–33 (1938) [hereafter *Foreign Relations*]. This new policy, expressed in § 317 of the Tariff Act of 1922, Pub.L. No. 67–318, 42 Stat. 944, led to the negotiation and signing of FCCR treaties between the United States and more than a dozen of its trading partners, including Honduras. *See generally* R. Wilson, *United States Commercial Treaties and International Law* (1960). Unlike the

generation of commercial treaties that preceded them, FCCR treaties extended guarantees of legal protection, access to foreign courts, and the right to conduct business to corporations as well as to individuals. *Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 186–87 & n. 16, 102 S.Ct. 2374, 2380 & n. 16, 72 L.Ed.2d 765 (1982). The provisions of FCCR treaties are self-executing. *See Restatement of the Foreign Relations Law of the United States (Revised)* § 131, reporter's note 5 (Tent. Final Draft 1985) [hereafter *Restatement*].

The first FCCR treaty was negotiated with Germany; signed on December 8, 1923, 44 Stat. 2132 (1925), it set the pattern for all subsequent FCCR treaties with other countries. R. Wilson, *supra,* at 237–38. The policy of the United States throughout this period was to preserve uniformity in the FCCR treaties to the greatest extent possible. *Id.* at 238 n. 126. Thus, the State Department initiated negotiations on the Honduras Treaty by informing the Government of Honduras that "the United States would be pleased to begin negotiations with Honduras for a treaty of friendship, commerce and consular rights similar to the treaty between the United States and Germany signed December 8, 1923." Telegram from the Secretary of State (Kellogg) to the Minister in Honduras (Summerlin) (July 12, 1926), *in* [1927] 3 *Foreign Relations* 92 (1942). These negotiations produced a treaty that differed in only minor respects from the FCCR treaties previously entered into with other countries. Especially relevant for our purposes, each of the earlier FCCR treaties contained an identical counterpart to Articles I and II of the Honduras Treaty.

---

**7.** Article I of the Honduras Treaty provides, in pertinent part:

The nationals of each High Contracting Party shall enjoy freedom of access to the courts of justice of the other on conforming to the local laws, as well for the prosecution as for the defense of their rights, and in all degrees of jurisdiction established by law.

45 Stat. 2619 (1929). Article II provides:

With respect to that form of protection granted by National, State or Provincial laws establishing civil liability for injuries or for

death, and giving to relatives or heirs or dependents of an injured party a right of action or a pecuniary benefit, such relatives or heirs or dependents of the injured party, himself a national of either of the High Contracting Parties and within any of the territories of the other, shall regardless of their alienage or residence outside of the territory where the injury occurred, enjoy the same rights and privileges as are or may be granted to nationals, and under like conditions.

*Id.* at 2620.

The classic enunciation of the rule governing the relative status of statutes and treaties is that in *Whitney v. Robertson*, 124 U.S. 190, 194, 8 S.Ct. 456, 458, 31 L.Ed. 386 (1888):

By the Constitution a treaty is placed on the same footing, and made of like obligation, with an act of legislation. Both are declared by that instrument to be the supreme law of the land, and no superior efficacy is given to either over the other. When the two relate to the same subject, the courts will always endeavor to construe them so as to give effect to both, if that can be done without violating the language of either; but if the two are inconsistent, the one last in date will control the other, provided always the stipulation of the treaty on the subject is self-executing.

■ Frequent invocations of the hornbook rule, *see Restatement, supra*, § 135, that a later treaty supersedes an earlier federal statute and *vice versa* neglect the Supreme Court's instruction in *Whitney* that courts should endeavor to construe the two so as to give effect to both—an instruction that incorporates the "cardinal principle of statutory construction that repeals by implication are not favored." *United States v. United Continental Tuna Corp.*, 425 U.S. 164, 168, 96 S.Ct. 1319, 1323, 47 L.Ed.2d 653 (1976); *see Tennessee Valley Authority v. Hill*, 437 U.S. 153, 189–90, 98 S.Ct. 2279, 2299, 57 L.Ed.2d 117 (1978); 5 Hackworth, *Digest of International Law* § 489, at 192–94 (1943). In other words, the hornbook rule addresses only the question of power; but an intention to repeal must be shown before the question of power arises. *See Posados v. National City Bank*, 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936) ("[T]he intention of the legislature to repeal must be clear and manifest...."); *Cook v. United States*, 288 U.S. 102, 120, 53 S.Ct. 305, 311, 77 L.Ed. 641 (1933). As Judge Becker wrote in *Zenith Radio Corp. v. Matsushita Electric Industrial Co.*, 494 F.Supp. 1263, 1266 (E.D.Pa.1980), *aff'd sub nom. In re Japanese Electronic Products Antitrust Litigation*, 723 F.2d 319, 323–24 (3 Cir.1983), a

court's inquiry in passing upon a claim that a later treaty repealed an earlier federal statute

is two-fold. First, we must examine the language of the statute and of the treaty to determine whether there is "a positive repugnancy" between them, *Hill, supra*, 437 U.S. at 190 [98 S.Ct. at 2299], ... *quoting Wood v. United States*, 41 U.S. (16 Pet.) 342, 363 [10 L.Ed. 987] ... (1842), which renders them irreconcilable. Second, we must examine the legislative history of the Treaty to determine whether there is "some affirmative showing of an intention to repeal," *Hill, supra*, *quoting [Morton v.] Mancari*, ... [417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974)].

■ With respect to Article I of the Honduras Treaty, we need not go beyond the first of these inquiries, since there is nothing in the language that conflicts in any way with the reciprocity clause of the PVA. Article I affords treaty nationals "freedom of access to the courts," which is conditioned upon their "conforming to the local laws." This very general language does not purport to define new jurisdictional relationships or broaden existing waivers of sovereign immunity. Indeed, access is expressly limited to such "degrees of jurisdiction established by law," which demonstrates that the drafters of Article I considered "access" and "jurisdiction" to be separate concepts.

This limited reading of Article I is also consistent with its history. Guarantees of free access to courts were a common feature of the generation of commercial treaties signed prior to World War I, *see* R. Wilson, *supra*, at 224–37, and the language of such guarantees formed the basis for the free access provision of article I of the FCCR treaties. Early treaties that defined the term "access" made it clear that the guarantee extended only to procedural rights. *See id.* at 232–34. The limited scope of such guarantees was confirmed in *Maiorano v. Baltimore & Ohio Railroad*, 213 U.S. 268, 29 S.Ct. 424, 53 L.Ed. 792 (1909), in which the Supreme Court held that a general access provision in the 1871

commercial treaty between Italy and the United States did not define substantive rights and thus did not supersede a Pennsylvania statute depriving nonresident alien beneficiaries of the right to damages for wrongful death under state workmen's compensation laws. *Id.* at 274, 29 S.Ct. at 425.

Access provisions contained in the generation of commercial treaties signed after World War II demonstrate even more clearly that use of the term "access" in such treaties is intended to guarantee treaty nationals equal treatment with respect to procedural matters like filing fees, the employment of lawyers, legal aid, security for costs and judgment, and so forth. *See* R. Wilson, *supra,* at 239–41. In *Nicolas Eustathiou & Co. v. United States,* 154 F.Supp. 515 (E.D.Va.1957), the court, in ruling on the plaintiff's contention that the laws of Greece satisfied the reciprocity clause of the PVA, refused to find that an access provision in the 1954 commercial treaty between Greece and the United States imposed any duty on Greece to waive sovereign immunity for Americans bringing suit against its public vessels. The court held that the term "access" as used in the treaty "refers substantially to *procedural* requirements," noting that to hold otherwise "would suggest that the doctrine of sovereign immunity is abolished as to any country which may be a party to the Treaty." *Id.* at 518 (emphasis in original).

The question with respect to Article II is somewhat closer. As a matter of language, Article II prohibits invidious distinctions in the civil liability laws of either high contracting party with respect to granting a treaty national or his dependents a right of action or a pecuniary benefit for injuries or death. The PVA, however, does not purport to grant a right of action or a pecuniary benefit; it merely waives sovereign immunity under certain conditions, reciprocity being one of them. It is by no means clear that the language of Article II deals with the subject of sovereign immunity, either of a State or of the United States. It is still less clear that Article II—and, by

extension, its identical counterpart in every other FCCR treaty—was meant to outlaw a statute whereby the United States merely conditioned its withdrawal of sovereign immunity for suits in admiralty upon a similar withdrawal by a foreign plaintiff's home country.

Legislative history reinforces our conclusion. Civil liability provisions, which began to appear in commercial treaties in the early 1900s, were expressly designed to alter the *Maiorano* decision, *see supra,* which had occasioned considerable protest by the Italian government, *see* [1909] *Foreign Relations* 391–93 (1914); [1910] *Foreign Relations* 657–73 (1915). R. Wilson, *supra,* at 235–36. Although some early provisions failed to achieve the desired result, *see, e.g., Liberato v. Royer,* 270 U.S. 535, 46 S.Ct. 373, 70 L.Ed. 719 (1926), the more comprehensive and standardized language employed in article II of the FCCR treaties finally proved successful. R. Wilson, *supra,* at 236, 239 & n. 129; *see, e.g., Antosz v. State Compensation Comm'r,* 130 W.Va. 260, 43 S.E.2d 397 (1947) (article II of 1931 FCCR treaty with Poland held to supersede provision in state workmen's compensation law that nonresident alien beneficiaries were denied compensation for wrongful death). Nothing in the recorded negotiating history of the Honduras Treaty, *see* [1927] 3 *Foreign Relations* 92–100 (1942), or other FCCR treaties of the period, *see, e.g.,* [1926] 2 *Foreign Relations* 912–39 (1941) (Salvador); [1923] 1 *Foreign Relations* 22–29 (1938) (Germany); *id.* at 413–30 (Austria), suggests that article II was ever intended to reach further than this. There is no sign that any thought was given to the problem of sovereign immunity, much less to the repeal of § 785 of the PVA.

A chronology of the relevant events also supports the conclusion that repeal of § 785 of the PVA was not contemplated. The negotiations with Germany that produced the first FCCR treaty took place more than two years before enactment of the PVA; article II of that treaty—which remained unchanged in subsequent FCCR

treaties—could not possibly have been designed to alter a federal statute not yet on the books. The FCCR treaty with Germany was ratified by the Senate nearly one month before Congress enacted the PVA, and was proclaimed in the fall of 1925, just a few months after the PVA became law. FCCR treaties with two other countries, both signed within weeks of the PVA's enactment, were ratified and proclaimed the following year. *See* 44 Stat. 2379 (1925) (Estonia); *id.* at 2441 (Hungary). It is incredible, in the absence of supporting evidence, that the Senate in ratifying and the President in proclaiming these treaties meant to repeal the reciprocity clause of the PVA, characterized by the Supreme Court as "central to the scheme enacted by Congress," *Continental Tuna*, 425 U.S. at 171, 96 S.Ct. at 1324, which the Senate had passed and President Coolidge had signed only a few months before. If article II of these treaties was not intended to repeal § 785, the identical provision in the Honduras Treaty, which was ratified by the Senate after only brief consideration in an executive session, 69 Cong.Rec. 9891 (May 25, 1928), was equally not so intended.

We hold therefore that the reciprocity clause of the PVA survived both Article I and Article II of the Honduras Treaty.

### IV. *The Effect of the United States Citizenship of the Decedent and his Son, the Personal Representative*

█ Plaintiff argues that because the decedent was a citizen of the United States and he, as the decedent's personal representative, is also a citizen of the United States, the reciprocity clause of the PVA does not apply. Before we discuss the merits of this argument, it is desirable to set out the statutes on which plaintiff must rely for a cause of action.[8] The Jones Act, 46 U.S.C. § 688, provides in pertinent part:

Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply; and in case of the death of any seaman as a result of any such personal injury the personal representative of such seaman may maintain an action for damages at law with the right of trial by jury, and in such action all statutes of the United States conferring or regulating the right of action for death in the case of railway employees shall be applicable.

Two sections of the Federal Employers' Liability Act (FELA), 45 U.S.C. §§ 51 and 59, are involved: we quote the pertinent parts in the margin.[9] Section 761 of the Death on the High Seas Act (DOHSA), 46 U.S.C. § 761 *et seq.*, provides:

Whenever the death of a person shall be caused by wrongful act, neglect, or

---

**8.** Plaintiff seems to think that a cause of action is created by the PVA or the SIAA. Of course, this is not so. These statutes simply withdraw sovereign immunity; they do not create anything. *See Trautman v. Buck Steber, Inc.*, 693 F.2d 440, 444 (5th Cir.1982); *Nelson v. United States*, 639 F.2d 469, 473 (9 Cir.1980).

**9.** Section 51 provides, in pertinent part:
Every common carrier by railroad while engaging in [interstate] commerce ..., shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, in case of the death of such employee, to his or her personal representative, for the benefit of the surviving widow or husband and children of such employee; and, if none, then of such employee's parents; and, if none, then of the next of kin

dependent upon such employee, for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.
Section 59 provides:
Any right of action given by this chapter to a person suffering injury shall survive to his or her personal representative, for the benefit of the surviving widow or husband and children of such employee, and, if none, then of such employee's parents; and, if none, then of the next of kin dependent upon such employee, but in such cases there shall be only one recovery for the same injury.

**64**

default occurring on the high seas beyond a marine league from the shore of any State, or the District of Columbia, or the Territories or dependencies of the United States, the personal representative of the decedent may maintain a suit for damages in the district courts of the United States, in admiralty, for the exclusive benefit of the decedent's wife, husband, parent, child, or dependent relative against the vessel, person, or corporation which would have been liable if death had not ensued.[10]

■ Section 785 conditions the PVA's waiver of sovereign immunity upon reciprocity only with respect to suits brought "*by* a national of any foreign government." That plaintiff's decedent was a citizen of the United States is therefore irrelevant to determining whether the reciprocity clause applies here. The cause of action for pecuniary damages for wrongful death given by the FELA, as incorporated by the Jones Act,

> is independent of any cause of action which the decedent had, and includes no damages which he might have recovered for his injury if he had survived. It is one beyond that which the decedent had, —one proceeding upon altogether different principles. It is a liability for the loss and damage sustained by relatives dependent upon the decedent. It is therefore a liability for the pecuniary damage resulting to them, and for that only.

*Michigan Central Railroad v. Vreeland,* 227 U.S. 59, 68, 33 S.Ct. 192, 195, 57 L.Ed.

417 (1913); *accord St. Louis, Iron Mountain, & Southern Railway v. Craft,* 237 U.S. 648, 656–57, 35 S.Ct. 704, 705–06, 59 L.Ed. 1160 (1915). The same is true with respect to the cause of action created by DOHSA, *see* 46 U.S.C. § 762. We have considered whether a claim for the decedent's pain and suffering might stand differently with respect to the reciprocity clause from the claim for pecuniary loss. Although a claim for pain and suffering, which survives under § 59 of the FELA as incorporated by the Jones Act, does seem peculiarly personal to the decedent, the survival provision appears to amalgamate it with the claims of the family for pecuniary loss. At least we would not be willing to decide the contrary without the benefit of briefing and argument, especially in a case where there is nothing to show that death did not come instantaneously.

Plaintiff likewise derives no advantage from the fact that he, as the decedent's personal representative, is a citizen of the United States. The "personal representative" authorized to bring suit both under the FELA and DOHSA, as said in *In re Southern Steamship Company's Petition,* 135 F.Supp. 358, 360 (D.Del.1955),

> does not sue for the benefit of the estate of the deceased nor does any amount recovered or received become an asset of the deceased's estate, but the representative sues by virtue of an express statutory designation and holds the amount of recovery in the nature of a trustee for the benefit of those persons upon whose behalf the statute authorizes recovery.[11]

> As heretofore indicated, the administrator does not sue on behalf of the estate and any recovery or settlement does not constitute any asset of the estate. The personality of the plaintiff, to whom the cause of action is given, is the creature of the statute. The statute could as well have given the cause of action to the Clerk of the Court or the District Attorney to act as trustee in bringing the suit for the benefit of the relatives suffering pecuniary loss. The action is compensatory and intended to compensate the relatives alone for their pecuniary loss.
>
> 135 F.Supp. at 363.

**10.** We have not considered a third possibility, to which no one has adverted; namely, whether a cause of action exists under general maritime law. *See Moragne v. States Marine Lines,* 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970); *Sea-Land Services v. Gaudet,* 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974). *But see Mobil Oil Corp. v. Higginbotham,* 436 U.S. 618, 98 S.Ct. 2010, 56 L.Ed.2d 581 (1978) (disallowing damages under general maritime law for death on the high seas in addition to damages authorized under DOHSA; latter constitutes exclusive remedy where applicable).

**11.** The court said in another passage of the opinion:

Congress could not have intended that the important policy embodied in the reciprocity clause could be evaded in cases arising under the Jones Act or DOHSA by the easy expedient of appointing a personal representative who is a citizen of the United States.

Plaintiff contends, however, that our decision in *Lauro v. United States,* 162 F.2d 32 (2 Cir.1947), compels the opposite conclusion. Lauro, a longshoreman, had been killed in an accident on a public vessel docked in a New York harbor, leaving a wife and six minor children. The libel of his widow in a suit on behalf of herself and the children against the United States for wrongful death alleged that she was "a National of Italy, domiciled in the Borough of Brooklyn, City and State of New York" and had been "a resident of the State of New York for several years prior to and including the time of" the accident. It said nothing about the citizenship of the children. After deciding that the suit could be maintained only under the PVA, this court held, based on the allegations in the libel, that under § 785 the libelant-widow must prove her United States citizenship (or, in the alternative, reciprocity) as of the commencement of the action in order to sustain a judgment for loss of pecuniary benefits suffered by reason of Lauro's death. *Id.* at 35.

Although on its face the *Lauro* opinion gives some comfort to plaintiff, further analysis negates this. Contrary to her libel below, the libelant-widow's brief on appeal asserted that she and all six children had been citizens of the United States as of the commencement of the action—she by naturalization before bringing suit and they by birth. We directed that on remand the libelant-widow would have to show that the facts regarding her own citizenship were those asserted in her brief rather than the contrary ones pleaded in the libel. The United States citizenship of the children, not mentioned in our opinion, was apparently assumed.[12] Thus, *Lauro* stands merely for the unremarkable proposition that where the personal representative is also one of several beneficiaries seeking recovery, and the United States citizenship of all of the other beneficiaries has been shown, the personal representative must offer proof of his or her own United States citizenship in order for suit to proceed under the PVA. *Lauro* does not, as plaintiff would have it, stand for the proposition that the United States citizenship of the personal representative alone suffices to rule out the applicability of the reciprocity clause.

There might be more merit to an argument that plaintiff, as the decedent's son and a United States citizen, should at least be entitled to proceed under the PVA to recover the portion of the award for pecuniary loss and perhaps also for pain and suffering that would have been allocated to him individually. *Chicago, Burlington & Quincy Railroad v. Wells-Dickey Trust Co.,* 275 U.S. 161, 48 S.Ct. 73, 72 L.Ed. 216 (1927), would not forbid this; there the sole member of the class of beneficiaries initially entitled to recover under the FELA had died before an administrator was appointed, and the Court held only that this did not entitle a member of the second class of beneficiaries to recover instead. Nor would *Lauro* pose an insurmountable obstacle. To be sure, our direction that the libelant-widow had to prove her own United States citizenship, irrespective of the apparently conceded United States citizenship of her children, could be taken to imply that, in the absence of proof of reciprocity, *all* members of a class of beneficiaries must establish their United States citizenship before any one of them may proceed against

---

**12.** Regardless whether the allegations on appeal regarding the children's place of birth were true, proof of the libelant-widow's naturalization would independently have established the United States citizenship of any of her children who were under the age of eighteen years when such naturalization took place. *See* The Nationality Act of 1940, Pub.L. No. 76–853, § 314, 54 Stat. 1145–46, repealed and recodified by Pub.L. No. 82–414, § 403(a)(42), 66 Stat. 280 (1952) (codified at 8 U.S.C. § 1432) (conferring United States citizenship on child born outside of the United States of alien parents when a surviving parent becomes a naturalized citizen).

the United States under the PVA.[13] Nevertheless, in view of the wretched briefing in *Lauro* and the court's failure to articulate its reasoning on this point, we would not consider the decision a bar to plaintiff's individual recovery if counsel had presented any persuasive theory to support it. But neither in the complaints nor in any other papers filed in the long course of this litigation has counsel suggested such a theory or even alleged that plaintiff, as the oldest of the thirteen children, suffered any pecuniary loss as a result of his father's death.[14] Determining plaintiff's individual recovery would require the court to compute the entitlements of his mother and twelve siblings, *see Petition of Marina Mercante Nicaraguense, S.A.*, 248 F.Supp. 15, 26–28 (S.D.N.Y.1965) (Weinfeld, J.), *decree modified*, 364 F.2d 118 (2 Cir.1966), *cert. denied*, 385 U.S. 1005, 87 S.Ct. 710, 17 L.Ed.2d 544 (1967). This entire field is sown with so many mines, *see* Gilmore & Black, *supra*, §§ 6–29 to 6–34, that we decline to enter it without the benefit of briefing and argument, especially in a case where the issue may well be academic.

Affirmed.

---

**13.** Although nothing in the libel, the lower court's opinion, *see Lauro v. United States*, 63 F.Supp. 538 (E.D.N.Y.1945), or the briefs on appeal indicated the source of the libelant-widow's purported cause of action, the earlier opinion of this court certifying the question whether the PVA applied to actions for wrongful death, *see* 157 F.2d 416 (2 Cir.1946) (per curiam), and the opinion of the Supreme Court answering our question in the affirmative, *see American Stevedores, Inc. v. Porello*, 330 U.S. 446, 458, 67 S.Ct. 847, 853, 91 L.Ed. 1011 (1947), strongly suggest that the action was predicted on §§ 130–34 of the New York Decedent Estate Law. Under those provisions, the widow and children constituted a single category for whose benefit any recovery would inure.

**14.** Pecuniary loss resulting from the decedent's death is the measure of damages under both the FELA, *see Michigan Cent. R.R. v. Vreeland*, 227 U.S. 59, 70–71, 33 S.Ct. 192, 196, 57 L.Ed. 417 (1913), and DOHSA, *see Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 620, 98 S.Ct. 2010, 2012, 56 L.Ed.2d 581 (1978) (citing express language of 46 U.S.C. § 762). Thus, while plaintiff need not prove he was legally "dependent" on his father to recover, "the dependency idea cannot be lost sight of." Gilmore & Black, *supra*, § 6–30 at 362 n. 174.