947 F.2d 218
 GOULD, INC., Plaintiff-Appellee,
v.
MITSUI MINING & SMELTING COMPANY, Japan; Miyakoshi Machine
Tools Company, Ltd., Japan, Defendants,
Pechiney Ugine Kuhlmann, France; Trefimetaux, France,
Defendants-Appellants.
 No. 90-3942.
 United States Court of Appeals,
Sixth Circuit.
 Argued March 29, 1991.
Decided Oct. 22, 1991.
Rehearing and Rehearing En Banc
Denied Dec. 10, 1991.
 
 Lance Gotthoffer, Marks, Murase & White, New York City, Robert S. Walker, Robert P. Ducatman, Jones, Day, Reavis & Pogue, Cleveland, Ohio, Richard Linn, Washington, D.C., John D. Jolliffe, Black, McCuskey, Souers & Arbaugh, Canton, Ohio, Maynard F. Thomson (argued and briefed), Samuel J. Najim, Jones, Day, Reavis & Pogue, Cleveland, Ohio, Lawrence M. Harnett, Marks, Murase & White, New York City, for plaintiff-appellee.
 Richard A. Zellner, Patricia A. Hemann, Hahn, Loeser & Parks, Cleveland, Ohio, Brice M. Clagett (argued and briefed), Herbert Dym, Richard Wm. Buchanan, Seth A. Tucker, Covington & Burling, Carlos M. Vazquez, Washington, D.C., for defendants-appellants.
 Before MERRITT, Chief Judge, KENNEDY and NORRIS, Circuit Judges.
 ALAN E. NORRIS, Circuit Judge.
 
 
 1
 This is the second appeal by defendants Pechiney Ugine Kuhlmann and Trefimetaux from an order of the district court finding that they are not immune from suit under the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1332(a)(2), (4), 1391(f), 1441(d), 1602-1622 ("FSIA"). On the prior occasion, we remanded the cause for a factual inquiry into circumstances relevant to application of the FSIA in this case.
 
 BACKGROUND
 
 2
 Because the facts underlying plaintiff's lawsuit are set out in our opinion resolving the prior appeal, Gould, Inc. v. Pechiney Ugine Kuhlmann, 853 F.2d 445 (6th Cir.1988), our recitation here will be brief.
 
 
 3
 Plaintiff Gould manufactures electrolytic copper foil, which is used in producing printed computer circuit boards, at its foil division in Eastlake, Ohio. Dale C. Danver was an engineer in plaintiff's foil division until August 1983, when he left to form Danver Technologies Group, Inc. Danver then entered into negotiations regarding copper foil manufacturing with Trefimetaux, a wholly owned subsidiary of Pechiney, and with Pechiney. A majority of the shares of the defendant corporations was owned directly or indirectly by the Republic of France. Although neither Pechiney nor Trefimetaux had ever produced copper foil, they were interested in doing so. In late 1984, after Danver had transferred plaintiff's foil manufacturing trade secrets to defendants,[1] they informed Danver that they were no longer interested in entering into a joint venture with him to construct a foil manufacturing plant in France.
 
 
 4
 According to plaintiff's complaint, prior to Danver's negotiations with defendants, he sold information to Mitsui Mining & Smelting Co. describing Gould's manufacturing process for copper foil. In 1985, after terminating its relationship with Danver, Pechiney, presumably through its subsidiary Trefimetaux, entered into a joint venture with Mitsui for the construction of a copper foil plant in Northern France (the "Eurocel plant"). Plaintiff alleged that defendants were using the information transferred from Danver to them and Mitsui.
 
 
 5
 Defendants moved to dismiss plaintiff's complaint for lack of subject matter and personal jurisdiction, claiming that, as foreign states, they were immune from suit under the FSIA. Their motion was supported by an affidavit from the assistant to the president of Trefimetaux. Plaintiff filed a response, supported by an affidavit from one of its attorneys. The district court concluded that defendants were not immune from suit and denied the motion. We concluded that, while the methodology used by the district judge to analyze the issues was sound, those issues were not ripe for resolution. Accordingly, the cause was remanded for the production of evidence more probative and reliable than that which was then before us.
 
 
 6
 Upon remand, the district court referred the matter to a magistrate judge to conduct appropriate evidentiary proceedings and to submit proposed findings of fact to the court. The magistrate judge did so in a comprehensive seventy-page recommendation which was accepted, for the most part, by the district court. Based upon this more extensive evidentiary record, the trial court again found that it had both subject matter and personal jurisdiction over defendants and that venue was proper. It therefore denied defendants' motion to dismiss.
 
 DISCUSSION
 
 7
 As we pointed out in our earlier opinion, jurisdictional immunity of a foreign state is restricted to suits involving its public acts and does not extend to commercial or private acts. The FSIA is designed to facilitate suits in courts in the United States arising from commercial or private acts of foreign states. Gould at 449. In the first appeal, we determined that defendants qualified as foreign states under the FSIA. Gould at 450. Under that Act, foreign states are immune from suit unless the case involves certain commercial activity or other exceptions set out in the FSIA itself. 28 U.S.C. § 1604. Among the issues raised by the first appeal was the question of whether defendants had engaged in conduct which would operate as an exception to immunity under 28 U.S.C. § 1605(a)(2).[2] It was for clarification of that issue that the cause was remanded, and it is that issue upon which the present appeal is before us.
 
 
 8
 In the order first appealed from, the district court had found jurisdiction under both the first and third clauses of 28 U.S.C. § 1605(a)(2). The order before us now is based upon a conclusion by the district court that jurisdiction can be grounded upon the first clause--the court did not consider jurisdiction under the third clause.
 
 
 9
 When sections 1605(a)(2) and 1603(d) and (e) of Title 28 are read together, it is clear that a foreign state will not be immune from jurisdiction, pursuant to the exception found in the first clause of section 1605(a)(2), if the plaintiff's action is based upon a regular course of commercial conduct or a particular commercial transaction or act having substantial contact with the United States carried on by a foreign state.
 
 
 10
 In our earlier opinion, we began our review of the jurisdictional evidence upon which the district court had based its ruling with a cautionary note:
 
 
 11
 [T]he commercial activity relied upon by plaintiff for jurisdictional purposes must be also the activity upon which the lawsuit is based; that is, there must be a connection between that activity and the act complained of in the lawsuit. Accordingly, a finding that defendants have been "doing business" which might be sufficient to satisfy the personal jurisdiction requirements of many "long-arm statutes," may not meet the jurisdictional nexus requirements of 28 U.S.C. § 1605(a)(2).
 
 
 12
 Gould, 853 F.2d at 452 (citation omitted).
 
 
 13
 When the district court found that it had jurisdiction of plaintiff's claims under the first clause of 28 U.S.C. § 1605(a)(2), it did so under a scenario of facts different from the one which appeared to be raised by the sketchy facts we had before us on the first appeal.
 
 
 14
 The district court first determined that our conclusion on the first appeal, that the activity upon which plaintiff's claim is based was commercial rather than governmental, continued to be supported by the facts as found on remand. On the first appeal, we concluded that the evidence on whether the commercial activity complained of had "substantial contact with the United States," as required by 28 U.S.C. § 1603(e), required further development. On the basis of the extensive evidence developed on remand, the district court found that, in their transactions with Danver, defendants indeed had substantial contact with the United States. That finding is clearly supported by the evidence and is not disputed by defendants on appeal.
 
 
 15
 The remaining issue concerning the first-clause exception, which the district court resolved on remand, and which is the source of defendants' appeal, is its determination that plaintiff's claim "is based upon" the commercial activity which defendants carried on in the United States with Danver--the "Danver transaction."
 
 
 16
 As pointed out in the first appeal, the "based upon" requirement of 28 U.S.C. § 1605(a)(2) means that there must be a connection between the commercial activity sought to be proved for jurisdictional purposes and the activity upon which the lawsuit is predicated. In contrast to the requirements of many "long-arm statutes," the evidence relied upon to confer jurisdiction must be of activity having some connection or relationship to the activity giving rise to the lawsuit. Proof that defendants were involved on another occasion in the United States in commercial activity that has no connection with, or relationship to, the conduct which gave rise to plaintiff's cause of action will not suffice. Plaintiff is not required to prove every element of its case on the merits in order to satisfy the jurisdictional proof requirements of the first clause of 28 U.S.C. § 1605(a)(2). Instead, it must satisfy the court that its claim is based upon a commercial activity which had substantial contact with the United States; it needs to convince the court that it is not relying upon one episode for jurisdiction and another one for its claim.
 
 
 17
 The statute in question says only that a foreign sovereign is not immune "in any case in which the action is based upon a commercial activity carried on in the United States by the foreign state." An "action based upon commercial activity" should not be read as meaning an "action the elements of which are proven" or read to require the plaintiff to prove the merits of the case at the jurisdictional phase of the case.
 
 
 18
 In the instant case, upon the insistence of the defendant, the district court restricted plaintiff's merits discovery. It would be grossly unfair, therefore, as well as legally unnecessary, to require the plaintiff to prove the merits of the case at the jurisdictional phase of the case, as the defendant insists.
 
 
 19
 "Based upon" in the statute should be read as meaning that the cause of action arises from commercial activity in the United States. The "commercial activity" is the jurisdictional element, just as the presence of the defendant in the forum state is the jurisdictional element in cases raising issues of personal jurisdiction. In personal jurisdiction cases, we do not require the plaintiff to prove the elements of the cause of action stated in order to sustain jurisdiction. The bottom line is this: the facts of the cause of action do not constitute the jurisdictional element. The jurisdictional element is the commercial activity (that the defendants have conceded here), plus a theory, a gravamen, that the plaintiff's injuries arise from the commercial activity.
 
 
 20
 Here, the predicate for plaintiff's claim is defendants' dealings with Danver, which involved substantial contact with the United States. The gravamen of the lawsuit is that defendants wrongfully obtained and utilized plaintiff's technology and trade secrets. If, acting outside the United States, defendants utilized trade secrets which were obtained through the Danver transaction, then it can be said that plaintiff's lawsuit is based upon a commercial activity carried on in the United States.
 
 
 21
 Plaintiff had the burden of going forward with evidence in response to defendants' prima facie case that they were entitled to immunity. Gould at 451. Under the circumstances of this case, for there to be jurisdiction pursuant to the first-clause exception, plaintiff was required to produce evidence that defendants made use of its trade secrets which they improperly obtained either (1) directly from the Danver transaction, or (2) indirectly through Mitsui as part of a continuing course of conduct which included the Danver transaction. The district court found jurisdiction under the first alternative rather than the second (which was the example we posited for remand).
 
 
 22
 Defendants essentially agree with our characterization of plaintiff's burden of going forward with the evidence, saying that, in order for its action to be based upon the Danver transaction, plaintiff must show that the wrongful use of its trade secrets by Eurocel is the result of, or related to, that transaction. They contend that, as they did not themselves use the materials they received from Danver, or disclose them to either Mitsui or Eurocel, any use of plaintiff's trade secrets by Eurocel is not related to defendants' contacts with Danver and, therefore, plaintiff's action cannot be said to be based upon the Danver transaction.
 
 
 23
 Defendants retained the ultimate burden of persuasion, of proving that plaintiff's lawsuit is not based upon activity which is encompassed within the exception. Gould at 452. The magistrate judge, while perhaps confusing the burden of proof, apparently agreed with defendants to the limited extent that he concluded that there was not sufficient evidence to prove defendants indirectly obtained and used trade secrets Mitsui had received from Danver (the second alternative set out above).
 
 
 24
 However, insofar as use of material directly obtained from the Danver transaction was concerned, the district court disagreed with defendants' contention that they did not utilize the trade secrets they obtained directly from Danver. The court's conclusion that there was jurisdiction under the first-clause exception was based upon a finding that they did, and that finding is not clearly erroneous. The district judge pointed out that it learned on remand that, even though defendants knew Danver's technology was obtained from plaintiff, they nevertheless solicited and received from Danver a study concerning the feasibility of a copper foil manufacturing facility in France. That study included some of plaintiff's trade secrets. In addition, defendants stipulated that plaintiff's trade secrets were in use at Eurocel, and that the information they received from Danver included plaintiff's trade secrets. Protecna, the company that ultimately designed the Eurocel plant, had, at defendants' request, reviewed the information conveyed by Danver. This, the district court concluded, was sufficient evidence from which one could infer that information concerning plaintiff's technology, which defendants obtained directly from Danver, was used in the Eurocel plant project, independent of any use which may have been made of those trade secrets by Mitsui. This, the district court held, established that there was a connection between defendants' obtaining plaintiff's trade secrets through the Danver transaction and their use of them at Eurocel.
 
 
 25
 Evidence that Protecna, at defendants' request, reviewed and assessed materials containing plaintiff's trade secrets which defendants had received directly from Danver, that Protecna subsequently designed the Eurocel plant, and that plaintiff's trade secrets were in use at the Eurocel plant, is circumstantial evidence that it is likely that Protecna had this information in mind and utilized it to some extent in the design of the Eurocel plant. This circumstantial evidence exists, even though the magistrate judge found that there was no direct evidence that the information was used by Protecna. The district court found the inferred fact was persuasive and concluded that defendants had not met their "burden of disproving the evidence suggesting that Eurocel is using the information concededly obtained from Danver."
 
 
 26
 The magistrate judge found that defendants expected to use, and did use, the information they received from Danver in his feasibility study to assist them in obtaining the joint venture agreement with Mitsui and later used it in preparing their own study of the economics of the project proposed by the joint venture with Mitsui. This is evidence of improper and actionable use of the information obtained directly from Danver. That, as well as the evidence related in the previous paragraph and that of the Danver transaction, is sufficient to meet the demands of plaintiff's burden of going forward with evidence to establish the first-clause exception. It shows that, through negotiations with Danver having substantial contact with the United States, the defendants improperly obtained information about trade secrets and technology belonging to plaintiff and, as a part of a continuing course of conduct, utilized them to their advantage. This satisfies both requirements of the first-clause exception: that defendants must have carried on commercial activity in the United States, and that plaintiff's lawsuit was based upon that activity. Defendants failed to produce evidence adequate to satisfy their ultimate burden of persuading the court otherwise.
 
 
 27
 The order of the district court denying defendants' motion to dismiss is affirmed.
 
 
 28
 Defendants also appeal the district court's denial of their motion to disqualify plaintiff's counsel. Under the circumstances of this case, that order is not appealable at this time. Firestone Tire & Rubber Co. v. Risjord, 449 U.S. 368, 379, 101 S.Ct. 669, 676, 66 L.Ed.2d 571 (1981); Melamed v. ITT Continental Baking Co., 592 F.2d 290, 295 (6th Cir.1979).
 
 
 29
 KENNEDY, Circuit Judge, dissenting.
 
 
 30
 The acts relied upon by the majority are I believe either unsupported by the record, contrary to the magistrate judge's factual findings, or too attenuated from the acts on which plaintiff's claim is based to establish jurisdiction under the FSIA. The majority correctly states that "[plaintiff] needs to convince the court that it is not relying upon one episode for jurisdiction and another one for its claim." Majority at 221. The majority, I believe, fails in its effort to avoid this pitfall.
 
 
 31
 Initially, it should be noted what the majority does not rely upon to establish jurisdiction. The magistrate judge found that, although Protecna received information originally supplied by Danvers, there was no evidence that Protecna used this information in its design and construction of the Eurocel plant. Indeed, the magistrate judge specifically found otherwise stating that "[t]here is no evidence that Protecna and Eurocel incorporated into the plant any technology received by them from any source other than Mitsui."
 
 
 32
 To be sure, plaintiff did stipulate for purposes of the motion being reviewed that Gould technology was used to construct the Eurocel plant. The impact of this stipulation is neutralized when read in light of the magistrate judge's findings. Accepting for the purpose of the motion that Gould technology found its way into the Eurocel plant, Protecna undertook only to show that its use there was not a product of the French defendants' dealings with Danver in the United States. Under the magistrate judge's findings, the only route through which Gould technology could have been incorporated into the Eurocel plant was through its dealings with Mitsui. Regarding these dealings, the magistrate judge found that the French defendants had reasonable cause to believe that Mitsui was providing untainted technology to the joint venture.
 
 
 33
 In order to establish jurisdiction, the majority relies upon evidence that the French defendants used Gould technology obtained directly from the Danver transaction. The majority selects those facts which allow it to conclude that "one could infer that information concerning plaintiff's technology, which defendants obtained directly from Danver, was used in the Eurocel plant project, independent of any use which may have been made of those trade secrets by Mitsui." Majority at 222. Such an inference, however, contradicts the specific findings of the magistrate judge that no Danver information was used in the design or construction of the Eurocel plant. Neither the District Court nor the majority considered the magistrate judge's specific findings clearly erroneous. Thus, I believe the majority errs in its holding to the extent that it unjustifiably deviates from the findings of the magistrate judge.
 
 
 34
 The majority also points out that the French defendants directly used the Danver information in its negotiations with Mitsui. In other words, the Danver information enabled the French defendants to negotiate more effectively with the more sophisticated Mitsui. It is important to note, however, that this "use" did not lead to the incorporation of Danver technology at the Eurocel plant. Indeed, the record is clear that the design and construction of the Eurocel plant was based on Mitsui information. The majority therefore relies upon one set of facts to establish jurisdiction (the French defendants' dealings with Danver) and another set to establish a cause of action (the French defendants' dealings with Mitsui). This, in my opinion, is insufficient to establish jurisdiction under the FSIA, under the standard the majority itself recognizes.
 
 
 35
 In sum, the majority attempts to establish jurisdiction in two ways. They first conclude that the evidence permits them to draw certain inferences notwithstanding that the magistrate judge specifically found otherwise. The majority next relies upon a set of facts separate from those facts which give rise to the cause of action. The relationship between the possible use of information to negotiate a better contract for technology believed to be untainted is, in my opinion, too attenuated to establish jurisdiction.
 
 
 36
 I would reverse the decision of the District Court and dismiss the case because subject matter jurisdiction is lacking. For these reasons, I respectfully dissent.
 
 
 
 [1]
 Unless otherwise noted, the defendants referred to are Trefimetaux and Pechiney
 
 
 [2]
 28 U.S.C. § 1605. General exceptions to the jurisdictional immunity of a foreign state
 (a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case--
 ....
 (2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.
 28 U.S.C. § 1603. Definitions
 ....
 (d) A "commercial activity" means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.
 (e) A "commercial activity carried on in the United States by a foreign state" means commercial activity carried on by such state and having substantial contact with the United States.