991 F.2d 1376
 120 A.L.R.Fed. 803, 61 USLW 2651
 GENERAL ELECTRIC CAPITAL CORPORATION; Gelco Corporation;
International Couriers Corporation, Plaintiffs-Appellants,
v.
N. Bud GROSSMAN; Andrew C. Grossman; Richard W. McFerran;
Defendants,
Air Canada, a Canadian corporation; Peat Marwick Thorne,
formerly doing business as Thorne, Ernst &
Whinney; Defendants-Appellees,
Deloitte & Touche, formerly doing business as Touche (USA);
Defendants,
Deloitte & Touche, formerly doing business as Touche Ross
(Canada), (CANADA), Defendants-Appellees.
GENERAL ELECTRIC CAPITAL CORPORATION; Gelco Corporation;
International Couriers Corporation, Plaintiffs-Appellees,
v.
N. Bud GROSSMAN; Andrew C. Grossman; Richard W. McFerran;
Defendants,
Air Canada, a Canadian corporation; Defendant-Appellant,
Peat Marwick Thorne, formerly doing business as Thorne,
Ernst & Whinney; Deloitte & Touche, formerly doing business
as Touche (USA); Deloitte & Touche (Canada), formerly doing
business as Touche Ross (Canada), Defendants.
 Nos. 92-1128, 92-1317.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Nov. 11, 1992.
Decided April 14, 1993.
 
 G. Marc Whitehead, Minneapolis, MN, argued (Richard Kaplan, on the brief), for defendant-appellant.
 Counsel who presented argument on behalf of the appellee Air Canada was Samuel L. Hanson, Minneapolis MN, argued (Charles Rogers and Michael Krikava, John H. Hall, New York City, on the brief), for defendant-appellee Air Canada.
 Deborah J. Palmer, Minneapolis, MN, argued (Elliot Kaplan, Linda Foreman, and Glenn Oliver on the brief), for Peat Marwick Thorne.
 Michael Berens, Minneapolis MN, argued (Wendy Snyder and Constance Hill, on the brief), for Deloitte & Touche.
 Before JOHN R. GIBSON and MAGILL, Circuit Judges, and VAN SICKLE,* Senior District Judge.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 General Electric Capital Corporation, Gelco Corporation, and International Couriers Corporation[1] appeal from orders of the district court[2] dismissing their action against Air Canada, a Canadian corporation, for lack of subject matter jurisdiction under the Foreign Sovereign Immunities Act, 28 U.S.C.A. § 1602-1611 (West Supp.1992), and against Peat Marwick Thorne and Deloitte & Touche (Canada), both Canadian partnerships of chartered accountants, for lack of personal jurisdiction. G.E. Gelco argues that Air Canada was not entitled to sovereign immunity under the Act because: (1) Air Canada was an investor-owned corporation no longer owned by the Canadian government at the time G.E. Gelco filed suit; (2) three of the commercial activity exceptions to the Act applied; and (3) Air Canada waived the protection of the Act. As to the accounting partnerships, G.E. Gelco claims that the partnerships intentionally transmitted false financial reports into Minnesota failing to disclose information that they were obligated to provide in the United States with the purpose of defrauding United States citizens and, accordingly, the district court erred in concluding that there was no personal jurisdiction. Finally, G.E. Gelco argues that the district court erred in limiting discovery on jurisdictional issues. We affirm.
 
 
 2
 The facts that are determinative of the issues before us are relatively simple, but the transactional background is complex. Thus, we outline here only those facts giving rise to the controversy before us.
 
 
 3
 Gelco owned Gelco Express United through Gelco's wholly-owned subsidiary, International Couriers Corporation. Express is a Canadian corporation based in Canada, engaged in the retail sector of the overnight and same-day delivery courier business.
 
 
 4
 Air Canada was a Crown corporation owned by the Canadian government,[3] and provided passenger and freight air service in Canada and the United States. In February 1987, Air Canada representatives traveled to Minnesota to meet with officers and directors of Gelco, Bud Grossman, Andrew Grossman and Richard McFerran,[4] to discuss the possibility of purchasing Express. On March 6, 1987, Air Canada and Gelco executed a Letter of Intent in which Air Canada offered to purchase all outstanding shares of Express for seventy-two million Canadian dollars. The Letter of Intent provided that Air Canada would conduct an investigation and evaluation of Express before closing the transaction.
 
 
 5
 Air Canada hired Peat Marwick to assist in the investigation of Express. Peat Marwick discovered significant irregularities in Express's financial statements, including, among other things, that Express's allowance for doubtful accounts was inadequate and that there were other problems with its accounts receivable. Touche Canada had audited Express's 1985 and 1986 financial statements. As a subsidiary of Gelco, Express's financial statements were included in Gelco's consolidated financial statements, and Touche Canada provided Express's 1985 and 1986 financial statements to Touche USA in connection with Touche USA's audit of Gelco's 1985 and 1986 consolidated financial statements.
 
 
 6
 Based on the information Peat Marwick provided to Air Canada, Air Canada terminated its Letter of Intent with Gelco.[5] Nevertheless, negotiations between Air Canada and Gelco continued. Ultimately, Air Canada and Gelco negotiated a reduced price for Express, and, on July 14, 1987, the two executed a Share Purchase Agreement in which Air Canada purchased Express for $61.5 million Canadian dollars. The purchase price was subject to adjustment if, according to the audit report of Express's July 31, 1987 financial statements, Express had a negative net equity. On the other hand, if the purchase price was reduced, the agreement provided that Gelco retained the right to call off the sale.
 
 
 7
 Peat Marwick completed its work on the audit of Express's July 31, 1987 financial statements in September 1987. Representatives of Peat Marwick and Air Canada met, and Peat Marwick advised that it had serious concerns about the reliability of Express's financial statements. Peat Marwick also advised that it could not issue its formal audit report on Express's financial statements. Air Canada asked Gelco to waive the audit report requirement, and accept instead a certification from Peat Marwick that Express had a positive net equity of $2,252,334. Gelco agreed, and on September 17, 1987, Gelco completed the sale of Express to Air Canada.
 
 
 8
 Two weeks later, on October 2, 1987, General Electric and Gelco announced that they had entered into a merger agreement under which General Electric would acquire Gelco. On December 17, 1987, General Electric bought the outstanding shares of Gelco for $35 a share.
 
 
 9
 In November 1989, Air Canada and Express sued Gelco, International Couriers Corporation, Bud Grossman, Andrew Grossman, and McFerran in Canada for falsifying of Express's accounts receivable. That action is still pending.
 
 
 10
 General Electric, Gelco, and International Couriers then brought this action in March 1991 against Peat Marwick, Touche Canada, Touche USA, Bud Grossman, Andrew Grossman, Richard McFerran, and Air Canada, claiming that they conspired to suppress information about Gelco's financial status in order to dupe General Electric into buying Gelco at an inflated price. They also claimed that because of Peat Marwick's certification report, Gelco was unable to exercise its contractual right to cancel the transaction, leaving Gelco subject to a contingent liability to Air Canada.
 
 
 11
 Air Canada and the Canadian accounting partnerships moved to dismiss. Air Canada argued that because it was a Crown corporation at the time of the claimed wrongdoing, it qualified as a foreign state under the Foreign Sovereign Immunities Act, 28 U.S.C. § 1602-1611. The district court agreed that the Act provided immunity, and rejected the arguments that the Act did not apply because Air Canada was not a Crown corporation when the litigation started. General Electric Capital Corp. v. Grossman, Civ. No. 4-91-210, slip op. at 13-16 (D.Minn. Sept. 9, 1991). The district court also rejected arguments that the commercial activity exceptions under the Act applied, and the argument that Air Canada waived its immunity. Id.
 
 
 12
 Peat Marwick and Touche Canada moved to dismiss for lack of personal jurisdiction. The district court examined the contacts between the accounting firms and Minnesota and concluded that the contacts were insufficient to confer personal jurisdiction. Id. at 16-19. The district court also denied G.E. Gelco's motion for additional discovery on the jurisdictional issues. General Electric Capital Corp. v. Grossman, Civ. No. 4-91-210, slip op. at 6 (Nov. 8, 1991). G.E. Gelco appeals.[6]
 
 I.
 
 13
 G.E. Gelco first complains that the district court erred in dismissing its claims against Air Canada for lack of subject matter jurisdiction under the Foreign Sovereign Immunities Act. Under the Act, a "foreign state shall be immune from the jurisdiction of the courts of the United States" unless an exception to the Act applies. 28 U.S.C. § 1604. The district court held that the time for determining whether the Act applied was the time of the alleged wrongdoing, and because Air Canada was a Crown corporation at that time, the Act provided immunity. Slip op. at 14 & n. 9 (Sept. 9, 1991).
 
 
 14
 "The existence of subject matter jurisdiction is a question of law subject to de novo review." Keene Corp. v. Cass, 908 F.2d 293, 296 (8th Cir.1990). The foreign state has the burden of proving that it is entitled to sovereign immunity. Brewer v. Socialist People's Republic of Iraq, 890 F.2d 97, 100-01 (8th Cir.1989).
 
 
 15
 G.E. Gelco first argues that the language and history of the Act show that Air Canada is not entitled to sovereign immunity because it was not an "agency or instrumentality of a foreign state" as Air Canada was an investor-owned business corporation at the time G.E. Gelco brought suit. G.E. Gelco points out that the Act and the House Report define foreign state by using the verb "is", and the use of the present tense demonstrates Congress's clear intent that the assessment of whether a defendant qualifies as an "agency or instrumentality of a foreign state" be made at the time of suit. G.E. Gelco also argues that the structure of section 1603(b) supports this conclusion. It cites later provisions of the Act which use the past tense and argues that if Congress intended the Act to apply at the time of suit it would have used the past tense in section 1603(b) as well. It also points out that in determining whether an entity qualifies as a "foreign state," inquiry is made into whether the defendant is a citizen of the United States as defined in the diversity-of-citizenship statute, 28 U.S.C. § 1332 (1988), and that for the purpose of determining diversity jurisdiction, the status of the parties at the time of suit controls. G.E. Gelco further contends that other courts have consistently recognized the importance of the party's status as a foreign state at time of suit, and that this interpretation of the Act is consistent with congressional intent.
 
 
 16
 The Sixth Circuit, however, is the only circuit to consider the question before us.[7] In Gould, Inc. v. Pechiney Ugine Kuhlmann, 53 F.2d 445 (6th Cir.1988), the court held: "As to completed acts upon which the complaint is based, the parties are bound by the jurisdictional facts existing at the time of those acts." Id. at 450. In reaching this conclusion, the Sixth Circuit relied on In re The Western Maid, 257 U.S. 419, 42 S.Ct. 159, 66 L.Ed. 299 (1922). In that case, the Supreme Court held that sovereign immunity that attached while the subject vessel was government owned was not later lost when the vessel was transferred to private ownership. Id. at 432-33, 42 S.Ct. at 160-61. Although the Sixth Circuit supplied sparse analysis for its holding in Gould, we are convinced that it correctly interpreted the Act.
 
 
 17
 First, we are not persuaded that the use of the present tense in the Act and House Report shows congressional intent that immunity under the Act exist only if an entity is a foreign state at the time suit is brought. The use of the word "is" could speak to a variety of situations, including the time of the alleged wrongdoing. Cf. Wiener v. Eastern Arkansas Planting Co., 975 F.2d 1350, 1355 (8th Cir.1992). The doctrine of foreign state sovereign immunity was "created to effectuate general notions of comity among nations." First Nat'l City Bank v. Banco Nacional de Cuba, 406 U.S. 759, 762, 92 S.Ct. 1808, 1811, 32 L.Ed.2d 466 (1972); Verlinden B.V. v. Central Bank of Nigeria, 461 U.S. 480, 486, 103 S.Ct. 1962, 1967, 76 L.Ed.2d 81 (1983) ("sovereign immunity is a matter of grace and comity on the part of the United States"). The foreign policy concerns discouraging us from judging the acts of another nation are not necessarily eliminated because an entity is not a foreign state at the time of suit. See First Nat'l City Bank, 406 U.S. at 761-62, 92 S.Ct. at 1810.
 
 
 18
 Second, G.E. Gelco's argument that an entity is only protected under the Act if it retains "foreign state" status at the time of suit is not supported by its authorities. Unlike the situation we are faced with here, two of the cited cases considered whether the Act applied when the defendants were not foreign states at the time of the alleged wrongdoing but became foreign states on or after the time plaintiffs brought suit.[8] Callejo v. Bancomer, S.A., 764 F.2d 1101, 1106 (5th Cir.1985); Wolf v. Banco Nacional de Mexico, S.A., 739 F.2d 1458, 1460 (9th Cir.1984), cert. denied, 469 U.S. 1108, 105 S.Ct. 784, 83 L.Ed.2d 778 (1985). See also Braka v. Bancomer, S.A., 589 F.Supp. 1465, 1468-70 (S.D.N.Y.1984) (recognizing the importance of the status of the defendant at the time plaintiff brought suit, but not considering the question, as the defendant was a foreign state at the commencement of the suit as well as at the time of the alleged wrongdoing), aff'd, 762 F.2d 222 (2d Cir.1985). The timing issue was not discussed in West v. Multibanco Comermex, S.A., 807 F.2d 820, 823 (9th Cir.), cert. denied, 482 U.S. 906, 107 S.Ct. 2483, 96 L.Ed.2d 375 (1987), or McKesson Corporation v. Islamic Republic of Iran, 138 F.R.D. 1 (D.D.C.1991).
 
 
 19
 Appellants look to other rules of law governing diversity jurisdiction, diplomatic immunity and the act of state doctrine, which they argue provide immunity only when the entities have the required status at the time of suit. They also contend that the Supreme Court decision in Lujan v. Defenders of Wildlife, --- U.S. ----, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992), supports its interpretation, as that case instructs that subject matter jurisdiction "is to be assessed under the facts existing when the complaint is filed." Id. --- U.S. at ---- n. 4, 112 S.Ct. at 2141 n. 4.
 
 
 20
 We are unpersuaded. "Diversity jurisdiction exists to protect out-of-state litigants from state court bias." Smith v. Metropolitan Property and Liab. Ins. Co., 629 F.2d 757, 761 n. 7 (2d Cir.1980). Thus, it is consistent that the party's status at the time of suit controls for the purpose of determining whether diversity jurisdiction exists. Unlike the underlying purpose of diversity jurisdiction, the foreign policy considerations underlying sovereign immunity are not necessarily eliminated when the defendant loses its status as a foreign state before the time of filing suit. Diplomatic immunity and sovereign immunity, on the other hand, share the similar objective of protecting governmental decisions from judicial scrutiny. See First National City Bank, 406 U.S. at 761-62, 92 S.Ct. at 1810; Nixon v. Fitzgerald, 457 U.S. 731, 749-57, 102 S.Ct. 2690, 2701-05, 73 L.Ed.2d 349 (1982). Diplomatic immunity, however, is not necessarily lost when a person loses his diplomatic status before the time of filing suit. See Nixon, 457 U.S. at 749, 102 S.Ct. at 2701 (former President entitled to immunity from damages liability for acts committed during his presidency). Thus, the law of diplomatic immunity does not support G.E. Gelco's interpretation of the Act. The act of state doctrine is also driven by comity concerns between existing sovereigns. See First Nat'l City Bank, 406 U.S. at 765, 92 S.Ct. at 1812. The cases cited by appellant interpreting the act of state doctrine do not say that the defendants' status at the time of suit controls for the purpose of determining whether the act of state doctrine applies. See Republic of the Philippines v. Marcos, 862 F.2d 1355, 1360-61 (9th Cir.1988), cert. denied, 490 U.S. 1035, 109 S.Ct. 1933, 104 L.Ed.2d 404 (1989); Jimenez v. Aristeguieta, 311 F.2d 547, 557-58 (5th Cir.1962), cert. denied, 373 U.S. 914, 83 S.Ct. 1302, 10 L.Ed.2d 415 (1963). Finally, the Supreme Court's statement in Lujan concerns a party's standing which, consistent with the Court's underlying policy of requiring an actual case or controversy under Article III, § 2 of the Constitution, must be measured at the time of suit.
 
 II.
 
 21
 G.E. Gelco next argues that Air Canada's actions fall within one of the three commercial activity exceptions to the Act. Once a foreign state makes a prima facie showing of immunity, the plaintiff seeking to litigate in the United States then has the burden of showing that an exception applies. Walter Fuller Aircraft Sales, Inc. v. Republic of Philippines, 965 F.2d 1375, 1383 (5th Cir.1992).
 
 
 22
 The Act defines "commercial activity" as "either a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). The Supreme Court recently explained that "when a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the [Foreign Sovereign Immunities Act]." Republic of Argentina v. Weltover, Inc., --- U.S. ----, ----, 112 S.Ct. 2160, 2166, 119 L.Ed.2d 394 (1992).
 
 A.
 
 23
 The first clause of the commercial activity exception provides that a foreign state shall not be immune in any case "in which the action is based upon a commercial activity carried on in the United States by the foreign state." 28 U.S.C. § 1605(a)(2). "[C]ommercial activity carried on in the United States by a foreign state" is defined as "commercial activity carried on by such state and having substantial contact with the United States." 28 U.S.C. § 1603(e). Thus, this exception applies only when the action is " 'based upon' some 'commercial activity' ... that had 'substantial contact' with the United States." Saudi Arabia v. Nelson, --- U.S. ----, ----, 113 S.Ct. 1471, 1477, 123 L.Ed.2d 47 (1993). See, e.g., America West Airlines, Inc. v. GPA Group, Ltd., 877 F.2d 793, 796-97 (9th Cir.1989), overruled in part on other grounds, Weltover, --- U.S. at ----, 112 S.Ct. at 2168. The district court concluded that Air Canada's purchase of Express could not be construed as "commercial activity within the United States" because "Air Canada operated in Canada and the purchase primarily occurred there." Slip op. at 15 (Sept. 9, 1991).
 
 
 24
 G.E. Gelco points to two distinct activities of Air Canada which it argues constitute commercial activity carried on in the United States: (1) operating an airline; and (2) acquiring a business from a United States corporation.
 
 
 25
 A recent Supreme Court case disposes of G.E. Gelco's argument that this exception applies. In Saudi Arabia v. Nelson, the plaintiff was recruited and hired in the United States to work at a Saudi government-controlled hospital. --- U.S. at ----, 113 S.Ct. at 1471. After the plaintiff reported hospital safety problems, he was arrested, jailed, and tortured in a Saudi jail. Id. --- U.S. ----, 113 S.Ct. at 1475. He filed suit for personal injuries on a variety of theories, and the defendants sought immunity under the Act.
 
 
 26
 The Supreme Court held that plaintiff's action was not "based upon a commercial activity" within the meaning of the first clause of § 1605(a)(2). Id. --- U.S. at ----, 113 S.Ct. at 1477. The Court defined the phrase "based upon" to mean "those elements of a claim that, if proven, would entitle a plaintiff to relief under his theory of the case." Id. --- U.S. at ---- & n. 4, 113 S.Ct. at 1477 & n. 4. The Court reasoned that the commercial activities occurring in the United States (the recruitment and signing of the employment contract) although leading to the conduct that eventually led to the plaintiff's injuries, were not "the basis for" the suit. Id.
 
 
 27
 Similarly, here, the fact that Express conducted airline operations in the United States does not relate to G.E. Gelco's claims, nor do Air Canada's airline operations form the basis for the suit. Id.; America West Airlines, Inc., 877 F.2d at 797 (acts were not the "specific acts that form the basis of the suit"); Gould, Inc. v. Mitsui Mining & Smelting Co., 947 F.2d 218, 221 (6th Cir.1991) ("Proof that defendants were involved on another occasion in the United States in commercial activity that has no connection with, or relationship to, the conduct which gave rise to plaintiff's cause of action will not suffice").
 
 
 28
 There is little doubt that acquiring a commercial business constitutes "commercial activity". See Weltover, --- U.S. at ---- - ----, 112 S.Ct. at 2165-67; Walter Fuller Aircraft Sales, 965 F.2d at 1384-85. The question here, however, is whether this activity was "carried on in the United States." 28 U.S.C. § 1603(e) (emphasis supplied). G.E. Gelco says that Air Canada's negotiations for the purchase of Express, which included a meeting with Gelco in Minnesota, and telephone and wire communications into the United States (including sending a copy of the certification of net equity and Express's financial statements) constitute commercial activity in the United States. Citing Continental Grain (Australia) Pty. Ltd. v. Pacific Oilseeds, Inc., 592 F.2d 409, 420 & n. 18 (8th Cir.1979), which holds that wire and mail communications constitute an "act" in the United States, it reasons that these communications constitute an act "in" this country.
 
 
 29
 In Gould, the Sixth Circuit considered whether the actions of two corporations owned by the French government constituted commercial activity in the United States under the first clause of the commercial activity exception. 947 F.2d at 219-223. The court concluded that the commercial activity exception applied because the plaintiffs improperly used trade secrets obtained through the defendants' negotiations "having substantial contact with the United States." Id. at 222.
 
 
 30
 This situation is different from that before us. The accounting improprieties at Express about which G.E. Gelco complains all occurred in Canada. The acts which form the basis of the suit, Air Canada's purchase of Express, occurred primarily in Canada. See Nelson, --- U.S. at ----, 113 S.Ct. at 1477. Air Canada and Gelco executed the contract for the purchase of Express in Canada. Although Air Canada and Gelco did exchange letters, faxes, and telephone calls in the United States, almost all of the face-to-face negotiations concerning the purchase agreement occurred in Canada. Air Canada's meeting with Gelco in Minnesota and delivery of a Letter of Intent in Minnesota concerned Air Canada's first proposal, and, in any event, cannot be considered "negotiations having substantial contact." Cf. Gould, 947 F.2d at 222. Similarly, Peat Marwick's sending a copy of the certification of net equity and Express's financial statements were but one small part of a significant transaction, and is "not the basis" for G.E. Gelco's suit. See Nelson, --- U.S. at ----, 113 S.Ct. at 1477; America West Airlines, 877 F.2d at 796-97.
 
 
 31
 Even assuming Air Canada's contacts with Minnesota constitute "acts" in Minnesota, more is required. Although Continental Grain considered whether the court had subject matter jurisdiction under the federal securities laws, not whether sovereign immunity existed, it also concluded the acts in the United States must be "significant" in order to provide a jurisdictional basis. 592 F.2d at 421; see also Travis v. Anthes Imperial, Ltd., 473 F.2d 515, 523 (8th Cir.1973) ("it was also necessary that there be substantial acts with respect to the alleged violations in the United States"). G.E. Gelco points to no "significant" acts occurring in the United States.
 
 
 32
 G.E. Gelco next argues that even if none of Air Canada's fraudulent acts occurred in the United States, Air Canada's fraudulent conduct in connection with its acquisition of Express was "part and parcel" of Air Canada's air cargo business in the United States, and thus, it is irrelevant where the particular acts occurred. G.E. Gelco relies on Gemini Shipping v. Foreign Trade Organization for Chemicals and Foodstuffs, 647 F.2d 317, 319 (2d Cir.1981). In Gemini, the Second Circuit held that a guarantee to pay demurrage made by an organization owned by the Syrian government which contracted for the shipment of food was "commercial activity" because the guarantee was "part and parcel" of the purchase of rice, which occurred in the United States. Id. at 319. Gemini is factually distinguishable. Air Canada's courier business in the United States has little, if anything, to do with G.E. Gelco's claims of wrongdoing. The first commercial activity exception does not apply.
 
 B.
 
 33
 G.E. Gelco also complains that the district court erred in concluding that the second commercial activity exception did not apply. That clause applies to actions based "upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere." 28 U.S.C. § 1605(a)(2). G.E. Gelco claims that the following fraudulent acts occurred in the United States: Air Canada's agent, Peat Marwick, issued false financial information to Gelco in the United States; Air Canada and its agents and other co-conspirators willfully failed to disclose material information to Gelco and General Electric in the United States; and the Grossmans and Touche USA engaged in "conspiratorial conduct" in the United States.
 
 
 34
 The district court concluded that Air Canada's alleged wrongdoing could not be conduct falling within this exception, reasoning that Air Canada conducted almost all of its negotiations for Express in Canada, and that the accounting and auditing of Express occurred in Canada. Slip op. at 15 (Sept. 9, 1991).
 
 
 35
 The second commercial activity exception did not support jurisdiction in Zedan v. Kingdom of Saudi Arabia, 849 F.2d 1511 (D.C.Cir.1988), a suit based on a contract entered into in Saudi Arabia, notwithstanding that the recruitment of the engineer-plaintiff leading to Saudi Arabia's guaranty of the contract occurred in the United States. The court concluded that the acts encompassed by this exception are limited to those which in and of themselves are sufficient to form the basis of a cause of action. Zedan, 849 F.2d at 1514; see also Nelson, --- U.S. at ----, 113 S.Ct. at 1477. Here, G.E. Gelco bases its causes of action on Air Canada's purchase of Express, and the underlying accounting and auditing problems at Express. These activities all occurred in Canada. The examples cited by G.E. Gelco does not form the basis for its causes of action. Clause two of the commercial activity exception does not apply.
 
 C.
 
 36
 G.E. Gelco also argues that Air Canada's conduct and that of its agents and co-conspirators "easily satisfies" the third clause of the commercial activity exception. That exception excludes from immunity protection an act outside the United States "that causes a direct effect in the United States". 28 U.S.C. § 1605(a)(2).
 
 
 37
 The district court held that this exception did not apply because there was no direct financial loss to Gelco, and because any financial loss to General Electric could not be foreseeable as contemplated by the Act. Slip op. at 16 (Sept. 9, 1991).
 
 
 38
 After the district court's ruling in this case, the Supreme Court clarified the test to be used in determining whether a commercial activity has a "direct effect" in the United States. In Weltover, the Court specifically rejected the argument that § 1605(a)(2) requires that the effect be "substantial" and "foreseeable." --- U.S. at ----, 112 S.Ct. at 2168. The Court endorsed the view of the Second Circuit that "an effect is 'direct' if it follows 'as an immediate consequence of the defendant's ... activity.' " --- S.Ct. at ----, 112 S.Ct. at 2168. The Second Circuit explained that in order for a "financial loss to be 'direct,' the corporate entity must itself be placed in financial peril as an immediate consequence of the defendant's unlawful activity." Weltover, Inc. v. Republic of Argentina, 941 F.2d 145, 152 (2d Cir.1991) (citing Upton v. Empire of Iran, 459 F.Supp. 264, 266 (D.D.C.1978) (effect is direct where there is no intervening element), aff'd, 607 F.2d 494 (D.C.Cir.1979)). The Second Circuit also noted that in determining whether the effect in the United States is direct, courts often look to the place where legally significant acts occurred. 941 F.2d at 152; see Rush-Presbyterian--St. Luke's Medical Ctr. v. Hellenic Republic, 877 F.2d 574, 582 & n. 9 (7th Cir.), cert. denied, 493 U.S. 937, 110 S.Ct. 333, 107 L.Ed.2d 322 (1989). In Weltover, the Court held that Argentina's unilateral rescheduling of the maturity dates on government-issued bonds had a direct effect in the United States, because New York was the "place of performance" for Argentina's obligations, as the bondholders had designated New York for the place of payment and made some interest payments there. --- U.S. at ----, 112 S.Ct. at 2168.
 
 
 39
 The Fifth Circuit also recently applied the direct effect test in Walter Fuller Aircraft Sales, 965 F.2d at 1386-87. The court held that the Philippine government's act of contracting with a United States corporation for the sale of an aircraft had a "direct effect" within the United States. Id. The court reached this conclusion because the domestic corporation was forced to defend a quiet title action in the United States as a direct result of the Philippine government's seizure of the airplane and refusal to defend and hold harmless the United States corporation, despite an indemnity provision in their sale contract. Id.
 
 
 40
 G.E. Gelco argues that Air Canada's purchase of Express had four distinct direct effects in the United States, and we now analyze each specifically. That Air Canada's actions caused Gelco to rely on Air Canada's misstatements and omissions in the United States and prevented Gelco from exercising its contractual right to cancel the Gelco sale of Express did not cause Gelco an "immediate," or direct injury. Cf. Texas Trading & Milling Corp. v. Federal Republic of Nigeria, 647 F.2d 300, 312 (2d Cir.1981) (direct effect test satisfied when foreign corporation was to present documents and collect money in United States and American corporation suffered financial loss), cert. denied, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982). As the district court explained, the effect of Air Canada's actions was that Gelco received too much money for Express. Slip op. at 16 (Sept. 9, 1991). See also International Housing, Ltd. v. Rafidain Bank of Iraq, 893 F.2d 8, 11 (2d Cir.1989) (direct effect test not satisfied when there was no direct financial loss in the United States). Air Canada's alleged acts of concealment (stemming from the accounting and auditing of Express) occurred in Canada. There was no direct effect in the United States.
 
 
 41
 Similarly, General Electric's claim that it suffered injury in the United States because it paid too much for Gelco or because Gelco now faces a contingent liability from the Canadian litigation, does not constitute a "direct effect". General Electric was not placed in financial peril as an "immediate consequence" of Air Canada's activities. See Weltover, --- U.S. at ----, 112 S.Ct. at 2168. Air Canada owed a contractual obligation to provide the certification of net equity to Gelco, not General Electric, and at the time Air Canada bought Express, General Electric had no interest in Gelco. Indeed, General Electric does not allege that Air Canada knew of the General Electric-Gelco merger at the time Air Canada bought Express. Accordingly, the effect of Air Canada's actions on General Electric cannot be considered "direct".
 
 
 42
 Finally, G.E. Gelco's claim that Air Canada's conduct caused a direct effect by denying a United States corporation, Federal Express, the opportunity to acquire Express, is frivolous. This injury is speculative and, in any event, cannot be called an injury to General Electric. See Weltover, --- U.S. at ----, 112 S.Ct. at 2168. (New York's loss of status as a world financial leader is too speculative and remote to satisfy direct effect requirement).
 
 III.
 
 43
 G.E. Gelco next complains that the district court erred in failing to recognize that Canada and Air Canada waived Air Canada's claim of immunity under the Act. 28 U.S.C. § 1605(a)(1) provides that a "foreign state" shall not be immune from jurisdiction if it "has waived its immunity either explicitly or by implication."
 
 
 44
 First, G.E. Gelco asserts that the Canadian government waived immunity by publicly selling its Air Canada stock before this case began. This argument is simply a restatement of the argument that an entity is entitled to sovereign immunity only if it qualifies as a foreign state at the time of suit. We rejected this argument in Part I, supra.
 
 
 45
 Second, G.E. Gelco argues that the Canadian government waived sovereign immunity for Air Canada in the Air Canada Act, which provides that Air Canada "is not an agent of Her Majesty and its officers and employees are not part of the public service of Canada". Can.Rev.Stat. Ch. A-10, § 24 (1985). G.E. Gelco did not make this argument to the district court, and thus, we need not consider it on appeal. Schuldt v. Mankato Indep. Sch. Dist., 937 F.2d 1357, 1363 (8th Cir.1991), cert. denied, --- U.S. ----, 112 S.Ct. 937, 117 L.Ed.2d 108 (1992). Nevertheless, the provision in the Air Canada Act only clarifies the status of Air Canada vis-a-vis the Crown, and does not address the question of whether Canada waived its sovereign immunity for purposes of the Foreign Sovereign Immunities Act.
 
 
 46
 Third, G.E. Gelco claims that Air Canada implicitly waived its immunity by agreeing to submit to the "non-exclusive" jurisdiction of the Ontario courts in the Share Purchase Agreement. Waiver of immunity from suit in the United States courts cannot occur by implication unless the foreign state specifically contemplates the United States as a possible forum. See, e.g., Maritime Int'l Nominees Establishment v. Republic of Guinea, 693 F.2d 1094, 1100-04 (D.C.Cir.1982), cert. denied, 464 U.S. 815, 104 S.Ct. 71, 78 L.Ed.2d 84 (1983). The Share Purchase Agreement does not identify the United States as a forum, and thus, Air Canada did not waive sovereign immunity.
 
 
 47
 Fourth, relying on Bank of United States v. Planter's Bank of Georgia, 22 U.S. (9 Wheat) 904, 6 L.Ed. 244 (1824), G.E. Gelco urges that Air Canada waived its immunity by engaging a private agent and acting in conjunction with co-conspirators. In Planter's Bank, the Supreme Court held that a bank, partially controlled by the State of Georgia, was not immune for commercial acts. This case, however, simply stands for the proposition that a sovereign is not immune for commercial acts committed in the United States. Again, this argument is simply a reargument of the applicability of the commercial activity exceptions, which we addressed in Part II, supra. Air Canada did not waive its immunity under the Act.
 
 IV.
 
 48
 G.E. Gelco also appeals the district court's dismissal of Peat Marwick and Touche Canada for lack of personal jurisdiction. On appeal, we examine de novo the question of whether G.E. Gelco has established a prima facie case of personal jurisdiction. Dakota Indus., Inc. v. Dakota Sportswear, Inc., 946 F.2d 1384, 1387 (8th Cir.1991). We view the facts in the light most favorable to G.E. Gelco. Id.
 
 
 49
 The district court concluded that it did not have personal jurisdiction because the accounting firms lacked "minimum contacts" with Minnesota. This circuit has set forth a five-part test for evaluating the propriety of jurisdiction under the due process clause, Land-O-Nod Co. v. Bassett Furniture Indus., Inc., 708 F.2d 1338, 1340 (8th Cir.1983), and we recently set forth the due process requirements in Soo Line Railroad Company v. Hawker Siddeley Canada, Incorporated, 950 F.2d 526, 528-29 (8th Cir.1991):
 
 
 50
 The due process clause requires there be "minimum contacts" between the defendant and the forum state before the forum state may exercise jurisdiction over the defendant. World-Wide Volkswagen v.Woodson, 444 U.S. 286, 291[, 100 S.Ct. 559, 564, 62 L.Ed.2d 490] (1980). Sufficient contacts exist when "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there," id. at 297[, 100 S.Ct. at 567], and when "maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " International Shoe Co. v. Washington, 326 U.S. 310, 316[, 66 S.Ct. 154, 158, 90 L.Ed. 95] (1945) (quoting Milliken v. Meyer, 311 U.S. 457, 463[, 61 S.Ct. 339, 342, 85 L.Ed. 278] (1940)). In assessing the defendant's "reasonable anticipation", there must be " 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' " Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475[, 105 S.Ct. 2174, 2183, 85 L.Ed.2d 528] (1985) (quoting Hanson v. Denckla, 357 U.S. 235, 253[, 78 S.Ct. 1228, 1239, 2 L.Ed.2d 1283] (1958)).
 
 
 51
 G.E. Gelco claims that the accounting firms "purposefully directed" their activities into Minnesota by directing accounting reports into Minnesota with the knowledge that United States investors would rely on them, and thus, had "fair warning" they might be sued in Minnesota. G.E. Gelco says that both Touche Canada and Peat Marwick provided Express's financial statements to Gelco for Gelco to include in its consolidated financial statements filed with the Securities and Exchange Commission, and that because both accounting firms intentionally failed to disclose to Gelco and the United States investing public, including General Electric, their knowledge of financial irregularities at Express, they had "fair warning" their acts might subject them to suit in Minnesota.
 
 
 52
 G.E. Gelco argues that under the principles of "specific jurisdiction", the purposeful direction of even one false statement or omission into a forum is sufficient to warrant the exercise of personal jurisdiction there for claims arising from that conduct. G.E. Gelco contends that the situation here is analogous to that in Calder v. Jones, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984). In Calder, a professional entertainer brought a libel suit in California against the writers and editors of a newspaper article. Id. at 784, 104 S.Ct. at 1484. The Court held that the California court had personal jurisdiction over the non-resident defendants. The Court reasoned that the allegedly libelous article "concerned the California activities of a California resident," id. at 788, 104 S.Ct. at 1486, and that the "article was drawn from California sources," and that "California [was] the focal point both of the story and of the harm suffered". Id. at 789, 104 S.Ct. at 1486.
 
 
 53
 Calder is of little help to G.E. Gelco. Here, the "focal point" of the alleged wrongdoing and harm occurred in Canada, where Express was located, where its auditing and accounting functions took place, and where Air Canada's purchase of Express and related negotiations primarily occurred. Cf. Dakota Ind., 946 F.2d at 1391 (personal jurisdiction established in South Dakota where "brunt" of injury occurred). Although it can be argued that the effects of the harm ultimately occurred in Minnesota, under the circumstances, the accounting firms could not reasonably anticipate "being haled" into court there. G.E. Gelco is not helped by Reingold v. Deloitte Haskins & Sells, 599 F.Supp. 1241 (S.D.N.Y.1984), in which the district court found jurisdiction over an Australian accounting firm who prepared an audit that the firm knew or should have known would be used in United States securities law filings. Id. at 1259-61. In Reingold, the accountants issued the misleading audit directly to public investors. As explained below, this is not the circumstance here.
 
 
 54
 G.E. Gelco asserts that because Express's 1986 audited financial statements were consolidated with Gelco's, a Minnesota corporation, and filed with the Securities and Exchange Commission, Touche Canada had fair warning of possible suit in Minnesota. In connection with the 1986 Express audit, Touche Canada sent Express's financial statements to Touche USA for Touche USA's audit of Gelco's consolidated financial statements. These 1986 statements were not audited financial statements, and in any event, we are not convinced that the sending of financial statements into the United States establishes minimum contacts. See Leasco Data Processing Equip. Corp. v. Maxwell, 468 F.2d 1326, 1341 (2d.Cir.1972). Touche Canada last audited the financial statements of Express for the fiscal year ending July 31, 1986, and provided its audit report to Express. Air Canada bought Express from Gelco on July 14, 1987 and did not retain Touche Canada to audit Express's financial statements or assist it in its due diligence investigation of Express. Likewise, Touche Canada performed no work for Express or Gelco in connection with the Gelco side of the transaction. Touche Canada did allow Peat Marwick to inspect its audit working papers. That inspection, however, occurred in Canada. We see nothing to indicate that Touche "purposefully availed" itself of the privilege of conducting activities within Minnesota.
 
 
 55
 For similar reasons, we conclude that Peat Marwick did not have "minimum contacts" so as to satisfy due process. G.E. Gelco argues that Peat Marwick established minimum contacts with Minnesota by sending a copy of its certification of net equity to the Gelco directors in Minnesota and Express's 1987 financial statements to Touche USA (Gelco's auditors) in Minnesota. Air Canada hired Peat Marwick to assist it in the due diligence investigation of Express, and later, to audit Express's July 31, 1987 financial statements. Like Touche Canada, Peat Marwick performed its audit work in Canada under Canadian accounting principles and auditing standards for its Canadian client. Peat Marwick sent a draft certification of net equity to Gelco in Minnesota, and Gelco received a copy of the certification letter at the closing in Canada. Gelco received this information pursuant to the Gelco-Air Canada Letter of Intent which required Air Canada to keep Gelco "advised of the progress of the audit," and advise if there is "likely to be" a negative net worth. Peat Marwick, however, prepared the certification letter at Air Canada's request, and received no fees from Gelco. Similarly, Peat Marwick's sending a copy of Express's financial statements to Touche USA does not establish minimum contacts. Peat Marwick was not involved with General Electric's acquisition of Gelco. Peat Marwick did nothing to "purposefully avail" itself of the privilege of conducting activities within Minnesota.
 
 V.
 
 56
 Finally, G.E. Gelco complains that the district court abused its discretion in denying its request for additional jurisdictional discovery. The record before us, however, shows that G.E. Gelco submitted extensive discovery requests to Air Canada and the accounting firms. Air Canada and the firms provided detailed responses to the interrogatories and made available for inspection or actually provided the documents requested. We cannot conclude that the district court abused its discretion in precluding additional discovery.
 
 
 57
 We affirm the judgment of the district court.
 
 
 
 *
 The HONORABLE BRUCE M. VAN SICKLE, United States Senior District Judge for the District of North Dakota, sitting by designation
 
 
 [1]
 Because, as we later explain, General Electric acquired Gelco and its subsidiary, International Couriers, we will refer to these three appellants as G.E. Gelco
 
 
 [2]
 The Honorable Diana E. Murphy, United States District Judge for the District of Minnesota
 
 
 [3]
 On October 13, 1988, Air Canada became a publicly traded business corporation under the laws of Canada
 
 
 [4]
 These individuals collectively owned about 16% of the Gelco stock
 
 
 [5]
 G.E. Gelco contends that Air Canada conspired with the officer and director defendants to withhold adverse material information about Gelco (the wrongdoing at Express) from the public, and that the other defendants explicitly or implicitly entered into an agreement with the officer and director defendants and Air Canada to conceal their knowledge of irregularities at Express from Gelco's independent directors and the public. G.E. Gelco explains that if Air Canada terminated negotiations with Gelco, the officer and director defendants would have been required to publicly reveal the financial irregularities at Express, depressing the value of Gelco stock, and preventing Air Canada from expanding into the retail sector of the air cargo business
 
 
 [6]
 The district court held that G.E. Gelco's securities fraud claims were barred by the statute of limitations. General Electric Capital Corp. v. Grossman, Civ. No. 4-91-210, slip op. at 12-13 (D.Minn. Sept. 9, 1991). The district court denied Air Canada's alternative motions to dismiss for failure to allege a justiciable case of actual controversy and loss causation, id. at 11-12, and failure to state a RICO claim. Id. at 19-20. Air Canada cross-appeals these rulings. Because we affirm the district court's ruling on sovereign immunity, we need not consider these issues. The district court also denied the motions to dismiss filed by Touche USA, Bud Grossman, Andrew Grossman, and Richard McFerran, id. at 20-23, and G.E. Gelco's motion for an interlocutory appeal. General Electric Capital Corp. v. Grossman, Civ. No. 4-91-210, slip op. at 8 (D.Minn. Nov. 8, 1991). G.E. Gelco unilaterally dismissed the United States defendants (including the Grossmans and McFerran) without prejudice
 
 
 [7]
 The district court for the Northern District of Illinois recently indicated that the proper time to determine whether an entity is a "foreign state" for purposes of the Act is the time of suit. Ocasek v. Flintkote Co., 796 F.Supp. 362, 365 (N.D.Ill.1992). Needless to say, this district court decision is not binding on this court, and we do not find it persuasive
 
 
 [8]
 G.E. Gelco also refers us to two unpublished district court decisions which rejected the argument that the nonjury requirement of the Act applied even if the defendant lost its status as a foreign state before trial. These unpublished district court decisions have no precedential effect. 8th Cir.R. 28A(k). In any event, the issue in both cases concerned a defendant's ability to invoke the nonjury provision contained in the Act, and did not consider the issues of sovereign immunity or subject matter jurisdiction